Stephen C. Denham, plaintiff in error, vs. James T. Holeman, defendant in error.

[1.] The title to land of a purchaser at Sheriff's sale, cannot be prejudiced by an entry of a levy on personal property, and its dismissal by the plaintiff.

[2.] The head note to a case, whether put there by the Reporter or the Judge who writes out the opinion, is so far law only, as it is sustained by the judgment of the Court in the case.

[3.] To constitute adverse possession, it is not enough, for the claimant to go on

the land, at intervals, cutting down trees, deadening timber, and building a cowpen, and then abandoning for a while the premises.

[4.] The inclosure in a field of a quarter of an acre of land, in the extreme corner, the field including portions of several adjoining lots, will not draw after it, the occupation of the whole lot.

[5.] Neither will the *intention* of the tenant to resume possession, be a compliance with the statute of limitations.

[6.] To constitute adverse possession, the tenant must either remain permanently upon the land, or occupy it, in such a way as to leave no doubt upon the mind of the true owner, not only as to who the adverse claimant is: but that it was his purpose to keep him out of the land.

[7.] Adverse possession, must be made up of acts, which are open, visible, notorious and *continuous*.

[8.] It is impossible to lay down any uniform rule, as to the relative value of positive and negative proof. It depends upon the opportunity of the witnesses for knowing, and the degree of attention which they bestow upon the subject.

[9.] The Term "beyond seas" in a statute of limitations, is equivalent to, *without the limits of the State* where the statute is enacted.

[10.] The constitutionality of the act of limitations of 1817, (*Cobb* 567,) examined and affirmed.

[11.] It is no ground of error, that in tendering a set of interrogatories, to be read in a case, the witness is unintentionally called by a wrong name by the party offering them: the interrogatories having been examined by the other side, before being submitted to the jury.

Complaint for land, from Sumter county. Tried before Judge ALLEN, March adjourned Term, 1858.

This was an action commenced 14th February, 1856, by Stephen C. Denham, against James T. Holeman, for lot of land No. 221, in the 16th district of Sumter county.

On the trial, it appeared that the land was granted to Stephen C. Denham: That Holeman was, and had been since about the year 1850, in possession of the land living on it, and cultivating it; that Denham had lived in the State of Tennessee, since December, 1831, and never left there long enough to visit Georgia; that he was there at his residence from 1845 to 1852, inclusive. It appeared by the testimony produced on the trial, by defendant, that a *fi. fa.* was issued from a Justice's Court against Benajah J. Sanford and James

H. May, in favor of Lewis Collins, on which were the following entries:

"Levied the within *fi. fa.* on twenty head of sheep, more or less. July 10th, 1845.   JAMES T. HOLEMAN, L. C."

"Property sold for $2 00, and bought by Francis Mills, and the money claimed by an older execution, July 26th, 1845.          JAMES T. HOLEMAN, L. C."

"Levied the within *fi. fa.* on twenty-seven head of sheep. August 7th, 1845.        JAMES T. HOLEMAN, L. C."

"No property to be found whereon to levy this *fi. fa.*   Oct. 17th, 1845.                  WM. FLOWERS, L. C."

"Levied the within *fi. fa.* on two lots of land, Nos. 221, and 222, in the 16th district of Sumter county, as the property of James H. May, this 17th October, 1845.

WM. FLOWERS, L. C."

"Levy dismissed by plaintiff, Oct. 6th, 1845.

JAMES T. HOLEMAN, Const."

"The levy of the above *fi. fa.* on two lots of land Nos. 221, and 222, in 16th district of Sumter county, this day sold to James T. Holeman.   Lot No. 221, sold for $21 25, and lot No. 222, sold for $30 06¼, and money held up, by older *fi. fas,* December 2d, 1845.

G. M. WHEELER, D. Sh'ff."


The deed made by the Sheriff in pursuance of the sale of said land, and dated October 15th, 1850, was in evidence, and also a deed made by James H. May, to said Holeman, for the North half of the lot No. 221, in said 16th district, dated July 13th, 1840.

And also, a deed made by said Stephen C. Denham to Josiah Bradley in Wilkinson county, Georgia, on the 1st day of November, 1829; witnessed by James G. Bisdand and John R. Wells, J. P.

*G. M. Wheeler* testified: That he as Sheriff sold the land and made the Sheriff's deed to Holeman; that Holeman

moved on the land in the latter part of the year 1849, or first of the year 1850 ; that a deadening had been made and a horse lot built on said land in 1847 or 1848. Holeman passed his, witness', father's house some time in 1849, and said he was going on to the lot. He claimed it from the time of the Sheriff's sale up to 1850, he lived, however, in 1848 and 1849, in the 17th district. In answer to the question "who was in possession of lot No. 221, in the 16th district, in 1848 and 1849 ;" the witness answered, "nobody." On cross examination, said that nobody was living on the land in those years.

*A. W. Wheeler* testified: That Holeman moved on the land in January, 1850; in 1847, he made a deadening and built a horse lot on it. The witness cultivated a half or quarter acre in the corner of said lot which was fenced into a field made in the corner of four lots. He took possession of this field in March 1849, from Mrs. Driver, renting it from her. He asked and received Holeman's permission to cultivate the enclosed part of the lot No. 221; did it to avoid a difficulty with him, he being a curious man, and because he claimed the land, and witness did not know but he might come and take his crop. Holeman lived in 1847 and 1848, in the 17th district.

*Lewis Collins* testified: That Holeman made a deadening and built a horse lot on the land in 1847 or 1848, moved on it last of 1849, or first of 1850, and worked on the land at intervals during the time. There was a fire in the Spring of 1848, the deadening was prior to that fire.

Defendant's counsel then read as the interrogatories of Winfield Livingston, those of Green Robinson, and the mistake was not perceived until counsel for plaintiff received them to make up a brief of evidence. They were commented on by counsel on both sides.

*Robinson* testified in his answer: That the defendant Holeman went into possession of the land in the latter part of

the year 1847, or early in 1848; first he occupied lot 221, cut down timber, cleared land and built fences, and has been in possession of it ever since. Did not know the month or day, or upon what part of the lot these things were done, and does not know the exact lines of the lot.

Plaintiff then introduced—*Giles*, who testified : That he moved in the neighborhood of this lot in November, 1849, and Holeman was not in possession then, but that he moved on the lot in the latter part of 1849 or first of 1850.

*Moses Driver* testified: That he was well acquainted with the lot during the years 1847, '8, '9 and '50. Holeman camped on the lot in 1847 or 1848, while building the horse lot; staid there about two weeks; lived in the 17th district, was on the land at intervals working; not more than twice he thinks. The half or quarter acre named by A. M. Wheeler, was enclosed by witness for his mother, in her field, on an adjoining lot, without regard to the consent or claim of Holeman, and not as tenant or lessee of Holeman. The acts spoken of by witness, were continuous from time to time.

*Mrs. Anthana Driver* testified : She was well acquainted with the place. Some two years elapsed between the deadening of the trees and building on the lot by Holeman, and his settling on it to live. If he was in possession or exercised any other acts of ownership, or did any other work until he moved there, she did not know it; and thinks she would, as she lived in the neighborhood, and passed there frequently.

Plaintiff then read in evidence a certificate from B. B. De-Graffenreid, Secretary of the Executive Department of the State of Georgia, proving that the books of that department did not contain the name of John R. Wells, as being a Justice of the Peace in Wilkinson county, in the year 1829.

The testimony here closed, and the jury returned a verdict for defendant. Whereupon, plaintiffs counsel moved the Court for a new trial, on the following grounds :

Denham vs. Holeman.

1st. Because the Court permitted a *fi. fa.* issued from a Justices Court to be read in evidence as color of title, when a levy had been made upon personal property and undisposed of before the levy was made on the land.

2d. Because the Court refused to allow plaintiff to plead *non est factum* to a deed purporting to have been made by him to the lot of land in dispute.

3d. Because the Court remarked in the hearing of the jury, while counsel for plaintiff was reading the head note in the case of *Byrne vs. Lowry*, 14 *Ga. Rep.* 27, that the said head note was prepared by the Reporter, and was not *per se* authority, and could not be relied on, unless supported by the body of the decision.

4th. Because the Court in charging the jury the second request of plaintiff's counsel, which was as follows: " That if Holeman took possession of the land in dispute, and kept possession for a while, and then left the land with the intention of returning to it after some time, and resuming possession, and went to his house which was some miles from the land in another district, and resided there some time, and then returned and resumed possession of the land, the statute of limitations did not run in his favor during his absence from the land, and that it only began to run in his favor at the time he returned to the land," remarked, that the leaving the land as referred to, must be the same as an abandonment of the possession, and that the resuming possession showed that the leaving was not an abandonment.

5th. Because the Court refused to charge as requested by plaintiff's counsel, that if the one-fourth acre cultivated by A. W. Wheeler in 1849, was enclosed into a field of other parties on another lot of land without the privity or consent of Holeman, and that Wheeler in 1849, rented this field and cultivated this one-fourth acre as a part of said field, merely asking Holeman's consent to prevent a difficulty with him, then Wheeler's possession of this one-fourth acre cannot benefit Holeman in this suit.

6th. Because the Court refused to charge as requested by plaintiff's counsel, " that if the plaintiff has resided out of the State from a period anterior to the commencement of Holeman's possession and the grant of the land, to within three years before the filing of this writ in this cause, the statute of limitations does not run against him, and defendant cannot claim a statutory title," but instead thereof, charged the jury that the second section of the statute of 1817, entitled an Act, amendatory and explanatory of the statute of limitations in this State, passed the 7th December, 1805, so far as it regards idiots, lunatics and infants, was constitutional, and that the statute of limitations did run against non-resident plaintiffs in real actions.

7th. Because the Court refused to charge as requested by plaintiff's counsel, that Wheeler's cultivation of the one-fourth acre enclosed in Driver's field, was not such actual possession by Holeman of a part coupled with a claim of the whole, as will perfect title in him.

8th. Because the Court charged that if the jury believed from the testimony, that the defendant more than seven years prior to the bringing of the suit, took possession of the premises by clearing land, deadening timber, building fences and shelters, and from year to year continuously occupied the same by such means or by actually living on the same, and all this under color of title, they must find for the defendant.

9th. Because the Court charged the jury, that if they believed that even one-fourth of an acre of the land was cultivated by Wheeler avowedly, and openly, as tenant of defendant, that such cultivation and possession was the same as if defendant had himself done it, and if the next year defendant moved on the premises, and his possession with Wheeler's was seven years, plaintiff cannot recover.

10th. Because the Court charged, that if the defendant took possession in 1847 or 1848, and has never abandoned the same, but has continued the possession by such acts as

the nature of the property allowed, up to this time, the jury must find for the defendant.

11th. Because the Court charged, that it was not necessary that a man shall live upon land or stay all the time upon it to constitute adverse possession; it is sufficient, if he takes possession, and does not abandon or give up the possession.

12th. Because the Court charged, that the evidence of one witness swearing positively, is worth more than the negative evidence of half dozen witnesses ; so if the jury believe that Livingston testified that defendant built fences and cleared land, and continued in possession up to the present time, that would override the evidence of half a dozen that did not know of the act of possession.

13th. Because the counsel for defendant tendered a set of interrogatories as the interrogatories of one Wingfield Livingston to the plaintiff's counsel, and read them when they were the interrogatories of one Green Robinson.

14th. Because the jury found contrary to law, contrary to evidence and contrary to the weight of evidence.

The Court overruled the motion for a new trial, and counsel for plaintiff excepted, and thereon assign error.

SMITH & CRAWFORD, for plaintiff in error.

McCOY & HAWKINS, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This writ of error is prosecuted to reverse the judgment of the Court below, refusing to grant a new trial in this case.

[1.] It is complained in the first place, that the Court erred in allowing the *fi. fas.* to go in evidence under which the land was sold, for the reason that the entries on the executions showed that they were satisfied, before the land was levied on.

The facts upon which this objection is founded, are these:

Twenty-seven head of sheep had been levied on, and the levy dismissed by order of the plaintiff.

Whatever effect this may have had, if any, in a contest between a security and the creditor, it does not apply in an issue like this, between the purchaser and the defendant in ejectment.

The second ground is abandoned.

[2] As to this assignment, while it is not true that the Reporter puts the head notes to the cases; it is true, that the head note is not law, except so far as it is warranted by the judgment of the Court upon the facts of the case.   We must say however, that the head note in the case cited, to-wit: *Byrne vs. Lowry,* 14 *Ga. Rep.* 27, was fully justified by the case.

[3.] The next seven exceptions may all be considered and disposed of together.   And they bring up the law of this case arising upon the proof.

It is conceded, that the defendant never went into the actual possession of the premises in dispute, until about Christmas 1849.   To make his statutory title available for his protection, the adverse possession should have commenced as early as February, 1849; this action of ejectment having been brought in February 1856.   Now, the testimony is, that for several years, the defendant residing some miles off, did at intervals go upon the land, cutting down trees, deadening timber and fencing in a cowpen, which had fallen down.   At what time he began to build the house which he subsequently occupied, does not affirmatively appear.

[4.] It is further in evidence, that in 1849, Mr. Wheeler rented a small field of a Mrs. Driver, which took in the corners of four adjoining tracts of land : and in this field was included about a quarter of an acre of the land in dispute. Wheeler was not the tenant of Holeman, as assumed in one of the charges of the Court.   True, he states, that when he rented the land of Mrs. Driver, he spoke to Holeman, know-

ing him to be a "curious man," about this small piece of ground, which he claimed, as he did not wish to get into any trouble with him, still he rented the field of Mrs. Driver, and was her tenant.

[5.] Now, the Court held, that these several acts of trespass, repeated at different periods, indicated the intention of the defendant, to return to this land, and authorized the jury in finding, that his possession was continuous as well as adverse.

[6.] We do not so hold. To constitute adverse possession, the tenant must either remain permanently upon the land, or else occupy it in such a way, as to leave no doubt on the mind of the true owner, not only who the adverse claimant was, but that it was his purpose to keep him out of his land.

[7.] Suppose Denham had taken possession of this land, during the long intervals that it was abandoned by Holeman? Could he not have done this? Then he was not ousted of his right of entry by the successive trespasses committed by Holeman. Adverse possession is to be made out by acts which are open, visible, notorious and *continuous*; and does not depend upon the secret purpose or intention of the intruder; that he will return at his convenience, sooner or later, and re-occupy the land.

Neither is it true as intimated by the Court, that Holeman occupied the land in the only way of which it was capable. It was fit for planting and for nothing else. Why could it not have been cultivated? It was neither a gold mine, nor a turpentine forest.

As to the possession by Wheeler, of the quarter of an acre; in the first place, he did not hold as the tenant of Holeman. His possession therefore could not be reckoned to Holeman's account. Besides, in the second place, how could the inclosure of a quarter of an acre of this land, at one corner, in a field which took in a portion of three other tracts, give notice to the owner, that his lot of land was in jeopardy? He may not have thought that any of his land

was inclosed in this field.    In this case, the field  drew after it the few roods and not the occupancy of the few roods, the whole lot.

[8.] As to the charge respecting positive and negative testimony, no general rule can be laid down respecting it.   It depends upon a variety of circumstances, such as the opportunity of the witnesses for hearing, the attention being directed to the matter, &c.   I say to-morrow,—I expressed such and such views, in delivering this opinion this morning.   The crowded bar, who listened to it, testify in a body, that they did not so hear and understand me.   Engaged in listening intently as they are, who shall be believed ?   It would be quite different by and by, when they separate into groups over the  Court-room.   If I should swear that an attorney who is addressing the Court, and to  whom I am listening, said so and so, and the same careless auditors were to testify that they did not hear him.   If the neighbors living around this land swear, that Holeman did not occupy it, it is just as good as the evidence of others, that he did.   For the question of notorious possession,  depends upon facts capable of being equally well known  to each set of witnesses.

[9.] We think the Supreme Court of the United States gave the correct exposition of the Term, "beyond seas," in 3 *Wheaton* 541, and that the decision in 9 *Sergeant* & *Rawle*, was upon different words.

[10.] But is the Act of 1817, constitutional?   Judge ALLEN held, that it was.   Mr. Smith, the counsel of Mr. Denham, assails it upon the ground, that the body of the Act does not correspond with its title.   Mr. McCay, the attorney of Holeman, not being able  satisfactorily to reconcile this supposed  repugnance, denies, that this or any other Court has the  power to declare an Act of the Legislature unconstitutional.

This has ceased  to be an  open question in the Courts of this country.   It underwent a thorough  discussion immediately after the  establishment of the  State governments in

Denham vs. Holeman.

every State of the Union; and never received the sanction of a single judicial tribunal in the United States; see *Beall and others against Beall*, 8 *Ga. Rep.* 210; and has long since ceased to be agitated any where else, except in Georgia, where nothing it seems is ever to be considered as settled. Even the Legislature itself, long before the organization of this Court, instead of resisting this right, as assumed to be exercised by the Courts, did not hesitate to re-enact the law of claim and other statutes, so as to make them conform to this constitutional requirement. We deprecate such discussions. They consume time which might be much more profitably employed. Instead of wasting strength upon these radical doctrines, which have become threadbare, let us rather address ourselves to the law points, in cases, which must control the judgment of the Court. Such is the uniform habit and praiseworthy example of the most successful practitioners at the bar.

But notwithstanding the elaborate argumentation bestowed upon this point; is there in fact any antagonism between the title and the body of the Act of 1817? We think not?

The title is in these words: "An Act amendatory to and explanatory of the statute of limitations in this State, passed the 7th of December, 1805, so far as it regards idiots, lunatics and infants." *Cobb* 567. Now, the first section of the statute directs how it shall be construed, so as to favor idiots, lunatics and infants. The second section which it is insisted is unconstitutional, because not embraced in the title, simply provides, that no privileges shall be extended to non-resident plaintiffs, beyond those enjoyed by our own people. And this is the whole body of the Act. Let us now read the title as it should be read, for the purpose of ascertaining its true meaning: "An Act amendatory to the statute of 1805, and explanatory of that Act, so far as it relates to idiots, lunatics and infants." It will thus readily appear that the conformity is complete. The first section explanatory to the extent stated in the title, and the second section amendatory.

It is suggested by Mr. Prince the compiler, that the Act of 1805, is repealed by the Act of 1806; and was therefore not in force, as the statute of limitations in this State in 1817, and consequently could not have been the subject of amendment. The provisions of the Act of 1817, however, he admits, are equally applicable to the limitation Acts, which were then in force.

I am not entirely convinced, that this annotation is correct. The third section of the Act of 1806, revives to be sure, all Acts and parts of Acts *which militate against it.* But as remarked before, there being nothing in the Act of 1805 militating against the provisions we are considering, they may be permitted to stand even under the Act of 1817. This point at any rate is not in the case.

[11.] The only other ground of alleged error is, that a set of interrogatories were tendered and read as Livingston's, whereas they were the depositions of Robertson. Why did not plaintiff's counsel examine them when offered to him? It is conceded that this was a mere mistake, noticed by neither party, until after the trial; and nobody was hurt by the misnomer. There is nothing in the objection.

Judgment reversed.