Argued at Pendleton October 29, affirmed December 23, 1919, rehearing denied January 20, 1920.

# LOONEY *v.* SEARS.

(185 Pac. 925; 186 Pac. 548.)

**Adverse Possession—Title Need not be Perfect.**

1. It is not necessary, to make possession adverse, that a party should have a perfect title, or that he should even think he has a perfect title, but, on the contrary, he may know his title is weak and defective.

[As to what constitutes color of title sufficient to sustain action of adverse possession, see notes in 14 Am. Dec. 580; 88 Am. St. Rep. 701.]

**Adverse Possession—Sustained by Evidence.**

2. In an action to quiet title, under claim of title by adverse possession, evidence *held* sufficient to sustain a judgment for plaintiffs, although the person under whom plaintiffs claim failed to pay the taxes on the land, and did not return the same on his tax list.

PETITION FOR REHEARING.

**Adverse Possession—Confers Fee-simple Title by Operation of Law.**

3. Adverse possession for more than 10 years confers fee-simple title by operation of law.

**Ejectment—Title by Adverse Possession Available as Defense.**

4. One acquiring title to land by adverse possession can successfully defend an ejectment action brought by the owner of the record title.

**Quieting Title—Record Title is Cloud on Title by Adverse Possession.**

5. The deed to the owner of the record title is a cloud on the title acquired by adverse possession which the party having title by adverse possession may sue to remove.

**Taxation—Holder of Record Title is not Entitled to Reimbursement from Adverse Claimant for Taxes Paid.**

6. The holder of the record title to land in the adverse possession of another was paying taxes on his own land during the ten years necessary to give title to the adverse claimant, and thereafter was a mere volunteer with no right to reimbursement from the adverse claimant.

**Taxation—Record Owner Redeeming from Tax Sale not Entitled to Reimbursement from Adverse Holder.**

7. Under Section 3124, B. & C. Comp., providing that any redemption from a tax sale shall inure to the benefit of the person having the legal or equitable title subject to the right of the person making the redemption to reimbursement by the person benefited, the redemption by the owner of the record title of land in the

adverse possession of another inures to his own benefit and gave him no right to reimbursement.

**Taxation—Right of Person Redeeming from Tax Sale is Governed by Statute Then in Force.**

8. Laws of 1907, page 480, Section 69, requiring one suing to remove the cloud of a tax title to deposit all payments by the purchaser with interest, gave no right to interest to one redeeming from a tax sale in 1904, in view of Section 80, continuing the old statute in force as to taxes previously accruing.

**Interest—Recovery Depends on Statute.**

9. The right to recover interest as such must be found in the statute which confers it, and unless included it must be deemed excluded.

**Damages—Taxation—Record Owner of Land in Adverse Possession of Another is not Entitled to Interest on Taxes Paid.**

10. Payments of taxes on land in the adverse possession of another by the record owner who had redeemed from a tax sale were not within the interest statute (Section 6028, L. O. L., as amended by Laws 1917, p. 781), nor was interest recoverable as damages.

From Gilliam: DAVID R. PARKER, Judge.

In Banc.

This is a suit brought to quiet title to a strip of land described as follows:

Southeast quarter of northeast quarter, and the east half of the southeast quarter, of section 5, and the northwest quarter of the northwest quarter, of section 9, all in township 4, south of range 20, E. W. M. Gilliam County, Oregon.

The lands in question were originally what is generally known as "Forfeited Northern Pacific Railroad lands."

These lands were for a long time supposed to be a part of the land grant of odd sections to the Northern Pacific railroad, and were held by it for many years as a part thereof. However, in 1890 Congress passed an act forfeiting them. Prior to that time many persons had settled upon the lands under contracts with the Northern Pacific Railroad, expecting to purchase the same ultimately from that company. The act of Congress recognized their possessory rights and provided

that under certain circumstances and conditions they might purchase the lands so held.

Long prior to 1900 one William S. Bean had taken a homestead on the even section adjoining the land in dispute, and was in possession of the tract which is in dispute—probably in connection with his homestead—claiming it as railroad land.

At some time prior to 1890 William Looney seems to have purchased from Bean, the possessory right to Bean's homestead claim. About that time Bean moved away and left the country. Looney seems to have remained in possession, both of the homestead claim upon which he filed, and also the railroad land, which is now in dispute. Either at the time of the purchase of the homestead, or at some later time, there seems to have been some arrangement or oral contract between Bean and Looney in relation to the purchase of Bean's right to the railroad land.

In the year 1898 Bean filed upon and purchased the land under the act of Congress at $1.25 an acre, making an affidavit at the time that he was in possession of the land, and had been ever since prior to the year 1890 claiming it as Northern Pacific Railroad land, and expecting to obtain title to it from said company. Looney assisted him in making this proof and made a corrobatory affidavit.

On May 22, 1899, the government issued a patent to Bean for the land. Shortly afterwards and during the year 1900 there seems to have been a controversy between Bean and Looney, as to the terms and conditions under which Bean was to transfer the land to Looney, and Bean refused to make a deed of the land to Looney. He finally repudiated the transaction with Looney altogether, claiming that Looney had failed to comply with the terms of the contract on his part, and Bean there-

upon in the year 1901 transferred the land in question to Sears, the defendant herein. According to the testimony, Sears paid a consideration of about $725 for the land. About $600 of this was in satisfaction of a previous debt, and $125 was paid to Bean and his wife in cash.

Shortly after this transaction, Sears placed his deed from Bean upon the record and is now the unquestioned holder of the record title.

Bean and Looney are both dead, and this suit is brought by the heirs of Looney against Sears to quiet title, plaintiffs alleging that William Looney and his representatives have held adverse possession of the tract in question from the year 1890 up to the time of the commencement of this suit, which was about June, 1918. The only question in the case is whether or not the plaintiffs have title to the land by adverse possession.                    AFFIRMED.

For appellant there was a brief over the name of *Messrs. Ramsey, Lange & Nott,* with an oral argument by *Mr. William Ramsey.*

For respondents there was a brief and an oral argument by *Mr. T. A. Weinke.*

BENNETT, J.—There is no question but what the plaintiffs and their ancestor, William Looney, have been in possession of the land from the year 1900 up to the beginning of this suit. Neither can there be any serious question but what that possession was open, notorious and exclusive.

The undisputed evidence shows that William Looney had the land inclosed in the year 1900 (partly by his own fence, partly by the fence around his homestead

adjoining and partly by connecting with the fences of other neighbors). In 1901 he built a house upon it, two stories high and 16x24 feet in diameter, and afterwards it was enlarged by one of his tenants. He also built a barn on the place. At first he used the land for grazing purposes, but some time prior to 1908, he commenced to cultivate about 15 acres, and in that year one of his tenants, by the name of Rickard, broke up an additional 40 acres, which has since been in cultivation. Looney rented the land out at different times to different parties—once to a man by the name of Simon for two or three years, and again to Rickard, who farmed it for six years—from 1909 to 1914. At the time of his death the improvements Mr. Looney had on the place in dispute were valued by the witnesses at about $1,000 or $1,200.

The only question, therefore, is whether or not this possession of Looney was adverse to the rights of the defendant and *under claim of right.* As Looney himself is dead, the evidence is necessarily largely inferential and circumstantial.

On the one hand, there is his long, continual possession and his continuous acts of ownership over the property. He fenced it, improved it, built a house and barn thereon and rented it to at least two different parties, and the further fact that he did not pay any rent or in anywise recognize any superior right of the defendant.

In addition to this, there is the testimony of Robert Looney, son of William Looney, and several neighbors living in the vicinity, who testified that William Looney always claimed to own the land, from the year 1900 down to the time of his death.

Against this, on the other hand, is offered the undisputed fact that Looney did not pay the taxes; that the

land was constantly assessed to Sears, and that Looney in four different years made sworn returns of his property to the assessor and omitted to list or mention this tract.

In addition to this the defendant offered the testimony of one Portwood, who was county clerk between 1901 and 1905, and who testified in relation to the matter as follows:

"A. Well, about all I remember was that he had furnished Mr. Bean the money to buy the land from the R. R. Company, expecting to get a deed to it when Mr. Bean got the title, and that he never got it. That is, Bean had never given him a deed.

"Q. What further did he say, if anything, about claiming the land, or his interest in it?

"A. Well, about all I remember was that at one time he talked to me about some one had advised him if he would pay the taxes on the land, it would give him some right to hold it in some way; he had that impression, and he asked me about it. He thought if he paid the taxes before Mr. Sears did, it might help his case. We had some conversation along that line; I don't remember exactly what it was.

"Q. Did he say whether he claimed to own the land?

"A. I never remember hearing him say he owned it, but he had possession of it, farmed it. He didn't talk to me as though he owned it. I understood it was to be assessed to Mr. Sears.

"Q. How long ago was that, if you remember?

"A. I don't remember. But it must have been between 1901 and 1905, probably, different times during that time."

And again on cross-examination:

"Q. Did he, at the time he asked you about the payment of taxes, did his idea seem to be he was going to retain possession, he was going to hold possession, and he was going to try to get a better hold?

"A. Yes; I presume that is what the idea was.

"Q. He was trying to hold the land, trying to get a better hold?

"A. I don't know as to that. He simply asked me if I thought if he paid the taxes, he would have a better show to retain the land.

"Q. He was in possession of the land?

"A. Yes."

Defendant also offers his own testimony as to a conversation he had with William Looney in 1904, at a time when he came up to redeem the land from a tax sale. He says of this conversation:

"He told me he ought to have that land; that he had an agreement with Mr. Bean, and that he ought to have that land. He says, 'He has acted the scoundrel with me.' He used very strong language. He says, 'If I have to leave that land I will hunt up Bill Bean and kill him; he has betrayed me.' I said, 'Mr. Looney, you would hardly do that, after second thought.' "

There is considerable testimony and much discussion in the briefs as to the nature of the contract between Bean and William Looney regarding the land. It is evident from the record that there was some kind of a deal between them, in relation to this land, prior to the time Bean deeded it to Sears in 1901; but as both Bean and William Looney are dead, the evidence remains very nebulous and unsatisfactory as to what the nature of that agreement really was.

As we view it, however, that is wholly immaterial, for whatever that agreement was Mr. Bean repudiated it, claiming that Looney had not complied with the contract upon his part and made it impossible for him to transfer the land to Looney or to comply with any agreement in relation thereto, which had theretofore existed by deeding the land absolutely to Sears. After Bean had thus repudiated the contract and transferred the land to another party, claiming that he was no

longer under any obligation to convey to Looney, it could hardly be said that Looney continued to hold under the contract.

We think Looney's continuous possession for so long a time; his assertion of ownership and right to the land; the placing of a valuable house and barn and fencing on the land; the renting it, and taking the rents and profits to himself, were such unequivocal acts of ownership, as to overcome the inference which might otherwise be drawn from his failure to pay the taxes, or to return the property upon his tax list.

It is true that his failure to pay the taxes on the land and his failure to return the same on his tax lists was persuasive evidence against his claim of right, and if his acts of ownership were otherwise equivocal or doubtful, his failure to pay the taxes might turn the scales against him. But while the failure to pay the taxes, or to return the property for taxation, is competent evidence and of considerable weight, it is by no means conclusive.

In 2 C. J. 203, it is said.

"Payment of taxes is not an element of adverse possession, unless made so by statutory requirement, and the fact that the owner of land held adversely by another continues to pay the taxes assessed on the land will not preclude the latter from acquiring title thereto by lapse of time."

In 2 C. J. 270, it is said:

"Adverse possession of land may be shown by proof of the acts of the claimant as well as by his oral declarations. Exercise of the usual acts of ownership over the land in dispute is evidence to show that the possession was hostile. The character of the possession cannot always be determined from the declarations of the person in possession because he may not make any, nor are his declarations always conclusive against one

claiming under him.   Thus it is permissible to show
a conveyance of the premises by the claimant, or an
offer to convey them, or a mortgage, or a lease, or a
devise thereof, by him, or that he prevented cattle be-
longing to others from running at large on the land, or
built a residence thereon."

Nearly all of these distinguishing acts of ownership
occurred in this case, and in addition thereto, the over-
whelming testimony is, that Looney frequently, in con-
nection with his possession, asserted that he owned and
claimed the land.

In *Smith* v. *Badura,* 70 Or. 58, 61 (139 Pac. 107, 108),
it is said:

"If such person uses the property as his own, that is
one manner of declaring to the world, or the true
owner, that he is asserting a title in hostility to the
true title, and thenceforth the owner must beware.
Such entry and use raises a presumption of the claim
of right or title."

Again in *Dunnigan* v. *Wood,* 58 Or. 119, 124 (112 Pac.
531, 533), it is announced:

"Actual, open, notorious, distinct, and continuous
possession of real property, under a claim of right,
and not inconsistent with the other acts of the party or
circumstances in the case, raise a presumption that the
possession is hostile."

The statements of Looney to Portwood and to the
defendant, do not seem to show that Looney was not
claiming a right to the land.   The statements to Port-
wood import, on the contrary, that he was claiming it,
and seeking for means whereby he could make his right
more effective.   In the talk with Sears, he says:

"If I *have to leave that land* I will hunt up Bill Bean
and kill him."

We think this language, in connection with the fact
that he did not give up the land but continued in pos-

session, was an assertion of his claim of right. We do not say, "if I have to leave" a thing unless we are claiming that thing.

Of course, Looney knew all the time after Bean refused to make him a deed, that his title to the property was defective, and that he might have to give it up, but he was sticking in possession and by his actions sturdily asserting his claim, just the same.

1. It is not necessary to make possession "adverse" that a party shall have a perfect title, or that he shall even think he has a perfect title. On the contrary, he may know that his title is weak and defective and yet be holding adversely. In 2 C. J. 201, it is said:

"Mere knowledge on the part of claimant that the title was defective or was not a perfect title will not impeach the good faith of his purchase. Such knowledge is not in itself inconsistent with a *bona fide* claim of right."

In *Bessley* v. *Powder River Gold Dredging Co.*, 95 Or. — (185 Pac. 753), it is said by Judge BEAN, speaking for the court *in banc*:

"The terms 'claim of right,' 'claim of title' and 'claim of ownership,' when used in the books to express adverse intent mean nothing more than the intention of the disseisor to appropriate and use the land as his own to the exclusion of all others, irrespective of any semblance or shadow of actual title or right."

2. Here there was every element of adverse possession and that possession was continued for at least 17 years. For at least 14 years defendant Sears knew that Looney was in possession of the property, and ought to have known that he was exercising acts of ownership over the same.

In *Bessler* v. *Powder River Gold Dredging Co.,* 95 Or. — (185 Pac. 753), it is said:

"The Sumpter Lumber Co. knew, or should have known, of the possession and claim of plaintiff and his predecessors. An owner of premises is bound to take notice of the nature and extent of possession by claimant. The party holding the superior title is not in the condition of an ordinary and casual observer, but must diligently look to his own interests, know the boundaries of his own land, and ascertain the extent, meaning and locality of any settlement made within them without his authority."

In this case the defendant having knowledge of Looney's claim and of his possession, slept upon his rights for a period of more than fourteen years. He is now in no position to assert them.

The decree of the court below is affirmed.

                                     AFFIRMED.

---

Rehearing denied January 20, 1920.

## PETITION FOR REHEARING.

(186 Pac. 548.)

On petition for rehearing filed January 7, 1920.

                                     DENIED.

*Messrs. Ramsey, Lange & Nott,* for the petition.

*Mr. T. A. Weinke, contra.*

BURNETT, J.—It will be remembered that the plaintiffs began this suit against the defendant, claiming to have acquired title to the realty in question through their father, now deceased, by his more than ten years' adverse possession thereof and that a deed

from Bean, the patentee of the land, to Sears consti-
tuted a cloud on the title, which they desired removed.
Sears answered, asserting his title, stating in substance
that he had purchased the land from Bean, who was
then the owner of it, in fee simple, on July 26, 1901,
for a full and valuable consideration; and that he had
paid the taxes thereon, giving the amount paid for each
year from 1900 to and including 1914, amounting in
all to $236.87. ' He also averred that the taxes for 1899
became delinquent; that in satisfaction thereof the
property was sold to the ancestor of the plaintiffs and
that on May 9, 1904, Sears paid $7.60 for the redemp-
tion of the land.  The case was put at issue and after
a decree for the plaintiffs, which, however, awarded to
Sears a judgment against them for $236.87, the amount
of taxes he had paid directly, but omitted the $7.60
which he had paid on redemption, he appealed.  After
a careful examination of the evidence in an opinion by
Mr. Justice BENNETT this court concluded that the title
of the plaintiffs by adverse possession has been estab-
lished, and hence affirmed the decree.  The defendant
now moves to grant a rehearing or reconsideration of
the cause so as to allow him not only the principal
amount of taxes which he paid, but also the sum he
paid in redemption, together with interest on each item
from the date of its payment to the date of the decree.

3–5. It is unquestionable that the deed to Sears from
Bean gave the former the fee-simple title in the land.
We may safely assume for the purpose of this opinion
that at that time the ancestor of the plaintiff had no
title to the property.  His subsequent adverse posses-
sion for more than ten years, however, conferred upon
him the fee-simple title by operation of law, notwith-
standing the deed under which Sears claims: *Caufield
v. Clark,* 17 Or. 473 (21 Pac. 443, 11 Am. St. Rep. 845);

*Dunnigan* v. *Wood,* 58 Or. 119 (112 Pac. 531) ; *Stout* v. *Michelbook,* 58 Or. 372 (114 Pac. 929) ; *Parker* v. *Wolf,* 69 Or. 446 (138 Pac. 463) ; *Parker* v. *Kelsey,* 82 Or. 334 (161 Pac. 694) ; *McKinney* v. *Hindman,* 86 Or. 545 (169 Pac. 93, 1 A. L. R. 476). Although the ancestor became the owner at the end of that decade, he was without a record muniment thereof. At that time he could have successfully defended an ejectment action brought by Sears if he could have convinced the jury of that adverse possession. A judgment in his favor would have constituted record evidence of Looney's title. He was not, however, compelled to await the initiative of Sears. On the contrary, Looney or his successors in interest, as they did in this suit, could take the initiative and sue to remove the cloud caused by Bean's deed to Sears, and thus establish the Looney title of record. Bean's deed was a cloud on that title thus founded in adverse possession. This is true according to the test laid down in *Pixley* v. *Huggins,* 15 Cal. 127, to this effect, that if Sears, armed with a deed from the patentee, had commenced ejectment against the plaintiffs or their ancestor at any time after the expiration of the ten years' adverse possession, the latter would have been compelled to offer proof of the title thus acquired, in order to defeat the action : See, also, *Ward* v. *Dewey,* 16 N. Y. 519.

6. It thus appears that Sears suffered his estate to fail on account of his inattention to his own affairs. In other words, he slept on his rights until his adversary had acquired the property. Looney owed no duty to Sears. The defendant was paying taxes on his own land, at least for ten years. He in turn owed no duty to Looney to pay the taxes, and his payments after the latter obtained the title were those of a mere volunteer, giving rise to no liability on the part of Looney. They

were antagonists carrying on at arm's-length and entitled to any legitimate advantage gained.

7. The redemption occurred May 9, 1904, and was governed by the statute then in force, embodied in Section 3124, B. & C. Comp. Substantially that enactment gave to anyone the right to redeem property which had been sold for taxes, by paying to the tax collector for the benefit of the holder of the certificate of sale the amount paid at the sale, with interest thereon at the rate mentioned in the certificate, from the date of that document to the date of redemption. The redemptioner was also required to pay all subsequent taxes, assessments, penalties, interest and costs accruing after the certificate and paid by the holder thereof, together with interest. The section declares then that—

"Any redemption made shall inure to the benefit of the person having the legal or equitable title to the property redeemed, subject, however, to the right of the person making the same to be reimbursed by the person benefited."

As Sears then held the entire estate in the property redeemed, his redemption inured to his own benefit. Section 3125, B. & C. Comp., declares that the redemption "shall operate as a release of all the claims to such tract under or by virtue of the issuance of such certificate of sale." In other words, the individual acquired no title to the property. His act destroyed the effect of the sale, and no more.

8. The system of sale and redemption of land for taxes above noted was afterwards superseded by the legislation enacted in Chapter 267, Laws 1907. Section 69 of that act requires a suit to remove the cloud of a tax title to be commenced within three years from the date of the sale and that the plaintiff shall deposit with his first pleading the amount of all payments

made by the purchaser, with interest at 15 per cent per annum to be paid to the purchaser if his title fails. The Sears redemption occurred under the old statute which Section 80 of the new statute says must continue in force as to all taxes accruing on or before March 1, 1907. Hence he cannot claim anything in the way of interest or otherwise under the later enactment.

9, 10. Considering that the payments of the taxes made by Sears after redemption were either for his own benefit, as they were during the ten years at least, or were those of a volunteer after that, and, further, that neither party owed any duty to the other, it is not apparent why the plaintiffs should be amerced in any sum, because Sears slept on his rights. Much more is it problematical why we should allow interest on those payments. As pointed out by Mr. Justice HARRIS in *Sargent* v. *American Bank & Trust Co.*, 80 Or. 16, 46 (156 Pac. 431), the right to recover interest as such must be found in the statute which confers it, and unless it is included it must be deemed to be excluded. The payments by Sears do not come within the purview of the interest statute: Section 6028, L. O. L., as amended by Chapter 358, Laws 1917. Neither is a case presented where interest may be allowed as damages within the meaning of the precedents cited in the Sargent case. No damages in favor of Sears could be predicated upon the result of his own negligence and inattention to his own affairs. The case, therefore, stands thus: The Circuit Court awarded Sears a judgment against the plaintiffs and from that part of the decree they have not taken any appeal. They are thus deemed to have been satisfied with the same. The court has given Sears, indeed, a greater measure of relief than he could demand under the law. Equity follows the law and administers relief to the vigilant, but

not to the slothful.    We cannot go further than the Circuit Court did in this direction, and must therefore decline to modify our former holding.

The petition is denied.

AFFIRMED.    REHEARING DENIED.