Argued December 16, 1943; affirmed January 11, 1944

REEVES ET AL. *v.* PORTA ET AL.

(144 P. (2d) 493)

Before Bailey, Chief Justice, and Belt, Kelly, Lusk and Hay, Associate Justices.

*Kenneth B. Wood,* of Portland (Tyson Kinsell and Frank H. Reeves, both of Portland, on the brief) for appellants.

*Francis E. Sturgis,* of Hillsboro (William G. Hare, of Hillsboro, on the brief) for respondents.

HAY, J. This suit was instituted by the plaintiffs for the purpose of quieting title in themselves to cer-

tain real property in Washington county, described as lots 4, 7, 8, 23 and 24, McGill Acres. Each lot comprises one acre of land. They lie contiguous to each other, forming an L-shaped tract. Lot 4 comprises the foot of the L and projects into a small farm which is owned by plaintiffs. The complaint alleges that plaintiffs, for more than ten years prior to the commencement of the suit, have been "in actual, open, visible, notorious, exclusive and hostile possession, continuously," of said land, "holding the same adversely against the world." The defendants are the record owners, Lucy A. Porta owning lot 7, F. W. Brokaw lots 8, 23 and 24, and H. O. Yeisley and Bessie Yeisley lot 4. The defendants stood upon their record title, and denied the alleged adverse possession by plaintiffs.

After a protracted hearing, the trial judge filed a memorandum opinion holding that the plaintiffs had failed to establish their claim of adverse possession. An appropriate decree followed, and plaintiffs have appealed to this court.

■■ Ownership of land by adverse possession can be acquired only by actual, open, notorious, hostile, continuous and exclusive possession under a claim of right or color of title. *Stephenson v. Van Blokland,* 60 Or. 247, 118 P. 1026; *Thomas v. Spencer,* 66 Or. 359, 133 P. 822. These elements must coincide, and the possession must be continuous for the statutory period, which, in this state, is ten years. 1 Am. Jur., Adverse Possession, section 126; Section 1-202, O. C. L. A. Where adverse possession is in issue, it is held generally that all of the elements thereof must be alleged, and must be established by clear and positive proof. *Laurance v. Tucker,* 160 Or. 474, 85 P. (2d) 374; *Enright v. Meves,* 142 Or. 88, 18 P. (2d) 216; *Houck v. Houck,* 133 Or. 78, 283 P.

25, 288 P. 213; *Chapman v. Dean,* 58 Or. 475, 115 P. 154; *McNear v. Guistin,* 50 Or. 377, 92 P. 1075; *Chastang v. Chastang,* 141 Ala. 451, 37 So. 799, 109 Am. St. Rep. 45; 1 Am. Jur., Adverse Possession, sections 238, 246.

The plaintiffs' small farm, which adjoins the tracts in dispute, was originally the home of the parents of the plaintiff Frank H. Reeves. The plaintiffs acquired it about the year 1920, and thereafter they lived on it for some three years. Since then, the farm has been occupied, more or less continuously, by their tenants. On the oral argument, counsel for plaintiffs stated that the property in dispute is "comprehended within other lands of appellants," but obviously this statement was mere hyperbole.

The chief witness for the plaintiffs was Mr. Frank H. Reeves. He testified that the land claimed by plaintiffs was occupied by them personally for about three years, beginning with the year 1920. During that period, some ditching was done upon the premises, which ditching was intended, at least partially, for the drainage of other tracts which plaintiffs owned. He testified further that, for a period of twenty years beginning with the year 1920, the land was actually occupied by plaintiffs or by their tenants. Very early in the period, and before there could have been any foundation whatever for a claim of title by adverse possession, the plaintiffs tried to sell the whole property, including what they owned and also that involved in this suit, to a Mr. Blatter, telling him that they would have to quiet title to a portion of it. A Mr. Williams was tenant in 1924 and 1925, and was followed by several other persons as tenants at various times. There was a large spring of water on lot 4 which Mr. Reeves caused to be drained, and a portion of the lot was

placed in cultivation. He referred to this lot as "the clear ground", the remainder of the property being brush land. The tenants, he said, generally farmed the clear ground and leased (apparently subleased) the brush land for pasture. Between 1920 and 1935, there were many tenants. He was unable to name all of them or to state the consecutive order of their tenancy. He said that the property was farmed continuously, although one or two of the tenants made very poor efforts at farming. We quote from his testimony:

"A. * * * During the entire period the entire clear ground was used and occupied by my tenants being farmed by them in various crops and most of the time the brush land was pastured. There were a few of the tenants who didn't have cows. During a part of the time that ground was rented by the tenants to Mr. and Mrs. Stark; my brother Bert used it part of the time. I cannot give you the consecutive order of the tenants that I had. * * *

"Q. Now, can you tell the court how many of the tenants that you had living in the old George and Mary Reeves home from 1925 to 1935 that had cows and pastured them in 7, 8, 23 and 24, or horses, or goats or sheep or any other livestock that they put in 7, 8, 23 and 24 and pastured them?

"A. I cannot tell you how many of them; the most I could say would be several; otherwise I can't answer. * * *

"Q. Now, then, Mr. Reeves, can you tell the court, or can you give the court any idea how long a period of time during those years the land wasn't used by tenants who had no cows? * * *

"A. No, I can't; the property was pastured either by Bert using it or my tenants, my best recollection is continuously; if there was a period of time that it wasn't used it doesn't come to my mind. * * *

"Q. The best that you can state is that as to the period from '25 to '35 there were numerous tenants there?

"A. That is correct.

"Q. And that you don't know which of them had cows or didn't?

"A. Not to answer positively.

"Q. Or what periods of time 7, 8, 23 and 24 were used by tenants with cows, or weren't?

"A. Not to make a direct answer, I can't do it. You know renting property was a nightmare through a good period of time in there."

Mr. B. B. (Bert) Reeves, a brother of Mr. Frank H. Reeves, corroborated the latter as to the plaintiffs having resided in the old Reeves home for three years, beginning with the spring of 1920. He said that thereafter they rented the property to various people, and used the land in dispute practically at all times. He himself pastured his cow upon it for a good many years. He admitted, however, that other people besides him had cows upon the lots. He did not ask permission of the plaintiffs to pasture his cow upon the property, but, as to this, he explained: "The cow is like my bees, she lives on the public quite a lot." It was his cow, he said, and his brother had no jurisdiction over it. Being recalled to the witness-stand after a recess, he said that there was no need for him to ask permission to pasture his cow, because he had charge of the premises for his brother.

 .There are no buildings upon the property in suit. Evidently, the plaintiffs and their various tenants occupied buildings which were upon the old Reeves home place. The four uncleared lots appear to be logged-over land, grown up to brush, and more than one witness described them as a wilderness. No doubt

the plaintiffs and some of their tenants, from time to time, pastured cows upon them. Assuming that the land was adequately enclosed, this use would have been sufficient adverse possession if it was reasonably continuous, and if the other elements of adverse possession were also present. Probably, the pasturage of livestock was the use to which the property was best adapted. *Lais v. Smith*, 63 Or. 206, 127 P. 26. We are of the opinion, however, that the evidence of continuous use by the plaintiffs or their tenants was far from satisfactory, and may best be characterized as intermittent and disconnected acts of trespass. Adverse possession may have its basis in trespass, but the trespass must be continuous. The claimant, as one court has said, must "keep his flag flying, and present a hostile front to all adverse pretensions." *Olewine v. Messmore*, 128 P. St. 470, 18 A. 495. The occasional pasturing of cows upon a piece of brushy wilderness is not enough to put an owner upon notice that his title is being challenged by adverse possession, and we think that this is particularly true when, as in this case, the owner is nonresident.

■ The fence on the west boundary of the premises appears to have been erected, prior to 1920, by the owner of lands adjoining on the west. That on the south was erected to protect the north line of the old Reeves place. The evidence conflicts as to whether the north fence was erected by the owner of the land adjoining on the north, or partly by such owner and partly by Frank H. Reeves. We are not satisfied from the evidence that a substantial fence was maintained on the east line, or that any fence at all was maintained there continuously. There was, it appears, an insubstantial, two-wire fence, which had been permitted to decay and was insufficient to turn cattle. This fence was

situated in thick brush, was not visible from any road or entrance to the property, and could not be seen by any one viewing the property unless ''he worked his way through the brush to where the fence was located. * * * It was not such a substantial fence as would indicate that plaintiffs were taking possession of the property with the idea of claiming ownership thereof.'' (Memorandum Opinion of Trial Judge.) The claim of the plaintiffs not being based upon color of title, their possession, in order to constitute adverse possession under the law, should have been evidenced, in the circumstances before us, by a substantial enclosure of the property. The use of an insubstantial temporary fence, which was not even maintained continuously, to close a gap between line fences erected by the owners of adjoining lands, was not sufficient to cause the statute of limitation to begin to run against the record owners. *Ambrose v. Huntington,* 34 Or. 484, 56 P. 513; *Hamilton v. Fluornoy,* 44 Or. 97, 102, 74 P. 483; Anno., Ann. Cas. 1913 A, p. 755.

The evidence in respect of the cultivation of the cleared portion of lot 4 is equally unsatisfactory. It was established that the land was occasionally put in crop by plaintiffs and by various tenants, but it was not shown that it was used for crop purposes with even reasonable continuity.

Mr. Fred W. Brokaw, the record owner of three of the lots, resides in Los Angeles, California. He acquired the property in 1911 and 1914, with a view to making it his home when he should retire from active business. Since he became owner, he has visited the property approximately forty times during the years 1915, 1920, 1924, 1929, 1936, 1937 and 1939. He testified that there had been no change in conditions with respect

to fences since he purchased the land. All of the lots are covered with brush and small trees, and have been ever since he owned them. In 1940, while negotiating a sale of the lots to Edgar S. Hoak, he learned for the first time of the claims of the plaintiffs. The defendant H. O. Yeisley and his wife are the owners of lot 4. They purchased lots 4 and 25 for $1,200 in 1913. Until the spring of the year 1942, they were never advised, either directly or indirectly, of any claim asserted by plaintiffs against the property. Similar testimony was given by the defendants Bessie Yeisley and Lucy A. Porta.

■ It has been said that:

"* * * the acts of the alleged occupant must be so open and exclusive as to leave no inquiry as to his intention, so notorious that the owner may be presumed to have knowledge that the occupancy is adverse, and so continuous as to have furnished a cause of action every day during the required period. Acts not so continuous and of brief duration do not constitute such an adverse possession as is contemplated by law". *McNear v. Guistin,* supra.

"* * * To constitute adverse possession, the tenant must either remain permanently upon the land or else occupy it in such a way as to leave no doubt on the mind of the true owner, not only who the adverse claimant was, but that it was his purpose to keep him out of his land." *Denham v. Holeman,* 26 Ga. 182, 71 Am. Dec. 198, 201.

Measured by such standards, the proof in this case is fatally defective. If the occupancy of the premises by the plaintiffs was so open, hostile, notorious and continuous as to satisfy the requirements of the law respecting adverse possession, and if plaintiffs were keeping their flag flying and presenting a hostile front to all adverse pretensions for twenty years, it is in-

conceivable that Mr. Brokaw, in his many visits to the modest little tract upon which he expected to make his home in his old age, should have failed to become aware of the fact that some one was trying to take his property away from him. Yet we are satisfied that Mr. Brokaw visited the property many times, as he testified, and that he saw no evidences of adverse possession.

We have discussed only what seem to us to be the salient features of the testimony, although we have carefully considered all of it. The plaintiffs, in an endeavor to bridge the gaps in their evidence of continuous occupancy, have asked us to take judicial knowledge of "the trials and tribulations involved in renting small acreage over a long period of time in the 1920's and 1930's." Even if we were disposed to do so (which we are not), we fail to see how that would avail the plaintiffs, or compensate for their lack of evidence. Those who seek to deprive others of their property by adverse possession should anticipate that they will be held to strict proof, and that, lacking such, they cannot prevail against rightful owners.

■■ During all the period of the alleged adverse possession by plaintiffs, taxes were levied regularly against the property, but they paid none of them. The record owners paid them. Failure to pay taxes is, in itself, evidence against the plaintiffs' claims. *Phipps v. Stancliff,* 118 Or. 32, 245 P. 508; *Looney v. Sears,* 94 Or. 690, 185 P. 925, 186 P. 548; *Holtzman v. Douglas,* 168 U. S. 278, 18 S. Ct. 65, 42 L. Ed. 466; *Todd v. Weed,* 84 Minn. 4, 86 N.W. 756. It is held generally that such failure is not conclusive against one claiming title by adverse possession, and this is the rule in Oregon. In a doubtful case, however, it may turn the scales against

the claimant. *Looney v. Sears,* supra. The owner of property is bound to know that such property is subject to assessment for its proportional share of the public burdens. "Ordinarily, a person pays taxes on that which he claims to own." *Phipps v. Stancliff,* supra. The failure of one, claiming to hold land in adverse possession as against the legal owner, to have the land assessed to him and to pay the taxes thereon, particularly when he permits the legal owner to pay them, may be regarded as evidence of a furtive possession, or of a permissive one, or of a mere trespass. It is "strong and forcible evidence that the possessor did not intend to claim title adversely to the owner", (*Todd v. Weed,* supra) and in this case the trial judge so considered it.

The learned and experienced trial judge moreover had the advantage of hearing the witnesses and observing their demeanor upon the witness-stand. His opinion on disputed questions of fact is entitled to great weight. *James v. Ward,* 96 Or. 667, 190 P. 1105; *Larsen v. Lootens,* 102 Or. 579, 194 P. 699; *Trueblood v. Talkington,* 95 Or. 527, 188 P. 159. He held that the plaintiffs had failed to prove their claim of adverse possession, and our view of the evidence coincides with his.

The plaintiffs complain because costs were awarded to all of the defendants, although only one asked therefor. The awarding of costs in an equity suit is a matter which the statute leaves entirely to the discretion of the trial court (section 10-907, O. C. L. A.). Such costs should be awarded or refused according to the justice of each case. 20 C. J. S., Costs, section 10 a. The fact that the defendants did not ask for costs is immaterial, and, in our opinion, the trial court did not abuse its discretion in awarding them.

The decree is affirmed, with costs.