## BEAVER, aka BURANDT, *Respondent,*
### *v.*
## DAVIS et ux, *Appellants.*
550 P2d 428

*William Sloan,* Grants Pass, argued the cause for appellants. With him on the brief was Johnson, Sloan & Jordan, Grants Pass.

*Norma Beaver,* Medford, in propria persona.

Before O'Connell, Chief Justice, and Holman, Tongue, Howell, and Bryson, Justices.

BRYSON, J.

**BRYSON, J.**

This case involves title to a strip of land between adjoining land owners. On October 12, 1972, plaintiff, record owner of the land in question, brought an action in ejectment (ORS 105.005 et seq) against the defendants. Defendants' answer generally denied plaintiff's allegations and affirmatively alleged they held the land by adverse possession and sought to quiet title in the name of defendants.

The case was tried to the court. The equitable defense was to be tried first but, as is often the case, both cases were tried at the same time and witnesses were called out of order. The trial court entered a written memorandum opinion and findings that

"1. The Plaintiff is the owner and entitled to the possession of the premises described in Plaintiff's amended complaint.

"2. The Defendants have failed to establish any title to the premises under consideration by virtue of adverse possession or otherwise. * * *

"* * * * *."

and entered judgment in favor of the plaintiff. The defendants appeal.

The defendants first contend the trial court erred in finding that defendants had failed to establish adverse possession.

In *Scott v. Elliott,* 253 Or 168, 178, 451 P2d 474 (1969), we held:

"In order to establish title by adverse possession it is necessary to establish by clear and positive proof that there has been an actual, open, notorious, exclusive, continuous and hostile possession of the premises for the full statutory period of ten years (ORS 12.050) under claim of right or color of title. *Fry et al v. Woodward et ux,* 221 Or 39, 350 P2d 183 (1960); *Reeves et al v. Porta,* 173 Or 147, 144 P2d 493 (1944); *Laurance et al v. Tucker,* 160 Or 474, 85 P2d 374 (1939)."

Defendants had the burden of showing adverse pos-

session for a period of 10 years. ORS 12.050. We require that such proof be "clear and positive." *Muzzy v. Wilson,* 259 Or 512, 523, 487 P2d 875 (1971).

The following diagram, not to scale, illustrates the area in controversy.

Plaintiff purchased lots 1200 and 1400 in 1954. Defendants purchased lots 1300, 1301 and 1302 in

1960. The strip of land in controversy lies easterly of defendants' lot 1302. The corners in the southern rectangle have been numbered for convenience.

Much of the contradictory testimony concerns fences around the perimeter of the rectangular area. At one time all of the land was in a common owner. The testimony shows the land was used for grazing or obtaining firewood. When plaintiff purchased her lots in 1954 there was an old delapidated fence around the southern rectangle but it was "down." There has never been a fence or other visible boundary dividing defendants' lot 1302 from the southern portion of plaintiff's lot 1400.

Defendants' grantor, John Warden, purchased lots 1300, 1301 and 1302 in 1959 and sold to defendants in 1960. Defendants testified that at the time of their purchase Warden said he had five acres "on the hill"[1] and that they were led to believe that lot 1302 included the entire southern rectangle. The southern rectangle lies on top of a hill and slopes downward toward the highway. Several of defendants' witnesses, when testifying as to periods from 1961 to 1965, made reference to seeing sheep or horses "up there" without specifying what was meant by this language.

Defendants moved to the area from California in February, 1961. They testified that shortly thereafter they began clearing brush along the fences and cutting firewood within the rectangular area; that they observed an old wire fence and wooden panels between points 1 and 6 on the north end of the rectangle. The panels were similar to those which Warden, their predecessor, had used to fence in his sheep on lot 1300. They also testified that in March of 1961 they repaired all of the fences surrounding the rectangle and that it was then "sheep tight" and "horse tight." Defendants further testified that they replaced the wooden fence posts with steel posts in 1963.

[1]Lot 1302 contains 3.85 acres; lot 1301 contains 1.32 acres. Warden's reference must have been to the approximate five acres in these two lots.

Defendants, as well as other defendant witnesses, testified that they continued to cut firewood, pasture horses, run sheep, and raise guinea hens within the rectangular area during 1962.

Plaintiff lived near the highway on lot 1400. She testified there was no activity in the rectangular area by the defendants or any one in the early 1960's. Plaintiff's witness Yilek testified she saw no fencing between points 1 and 6 as late as 1964. Plaintiff testified that there was no fencing between points 1 and 6 but there had been fencing many years prior around the outer perimeter of the rectangular area but it was completely delapidated. Plaintiff produced other witnesses that testified there was no fencing between points 1 and 6 prior to 1965.

Much of the defendants' testimony is contradicted by Mr. Warden, from whom they purchased the property. The record shows that defendants contacted Mr. Warden, 86 years of age at the time of trial, but then did not call him to testify. Plaintiff contacted and called Warden as a witness. He testified there was no fence between points 1 and 6 on the north side of the rectangular area. He also stated that he knew approximately where his easterly line was located but that he did not use plaintiff's property and, in fact, did not run sheep on lot 1302. Warden denied that he had pointed out fences to the defendants or that he sold according to any fence lines; he stated that he sold strictly in accordance with the survey description contained in his contract and deed.

There is other testimony that defendants offered to purchase a portion of lot 1400 to the north of the rectangular area sometime in 1961. Plaintiff refused the offer to purchase any of lot 1400 north of points 1 to 6 unless the offer to purchase included that portion of lot 1400 lying in the southerly rectangle. Plaintiff further testified that she discussed selling the strip within the rectangle to defendants again in 1968.

Defendants admit that they approached plaintiff regarding the purchase of property in 1961. However, they contend plaintiff first mentioned the sale of the "strip of land," approximately 2½ acres in size, in 1968. Defendants further testified that they believed this "strip" was to the east of a line between points 6 and 7.

This is a case where there is conflicting testimony and the credibility of witnesses comes into play. In such a case it is proper to examine other testimony throwing any light on what actually took place or what was in the minds of the parties. *Reeves et al v. Porta,* 173 Or 147, 156, 144 P2d 493 (1944). In 1969 defendants made application for a loan secured by a mortgage on the property. Defendants' application was received in evidence and is signed by defendants. The application contains the following description and plat of the premises:

The distances noted in the diagram match the calls contained in defendants' contract and deed.

The trial court found:

"* * * [N]o later than the year 1965 the Court is of the opinion that the Defendant had ample notice from the Plaintiff that he was constructing his buildings on land other than his own but that he deliberately proceeded with his project. It is very difficult for the Court to understand how the Defendants could know that they had property 237 feet wide and yet use an additional 150 feet without any examination of the premises as to size or without knowing that they were taking an additional third as much property as they owned."

*Winthers v. Bertrand,* 239 Or 97, 396 P2d 570 (1964), is an adverse possession case very similar to the case at bar. At page 99 we stated:

"The trial court found that the defendant did not prove adverse possession. This is in equity and we are not bound by the trial court's findings. However, we do accord its findings considerable weight, particularly when the evidence is conflicting. * * *"

*See also Clauder v. Morser,* 204 Or 378, 392, 282 P2d 352 (1955).

■ We have not discussed all of the evidence but we have reviewed it in its entirety. We conclude that the defendants did not prove their case of adverse possession by clear and positive proof.

The trial court also found:

"3. The reasonable value of the premises is $7,500, and the reasonable rental value is the sum of $900 per annum.

"4. Plaintiff has been damaged in the sum of $5400 by virtue of the use and occupancy of the premises by the Defendants.

"* * * * *"

and the judgment entered included the sum of $5,400.

The defendants contend that the "court erred in assessing damages of $5,400 or any amount."

ORS 105.030 provides:

"The plaintiff shall only be entitled to recover damages for withholding the property for the term of six years next preceding the commencement of the action, and for any period that may elapse from the commencement to the time of giving a verdict, *excluding* the value of the use of permanent improvements made by the defendant. * * *" (Emphasis added.)

■ The measure of damages for withholding the property from plaintiff is determined by the reasonable rental value of plaintiff's property for the prescribed period, excluding the value of permanent improvements made by the defendants. *Rafferty v. Davis,* 54 Or 77, 82-83, 102 P 305 (1909); *Crane v. Oregon R. & N. Co.,* 66 Or 317, 329, 133 P 810 (1913), 173 ALR 1180 (1948). *See also, Scott v. Elliott, supra* at 182.

■ The court in assessing damages for withholding the property concluded "that the reasonable value of the premises under consideration is $7,500." On this basis he determined the rental value to be $900 per annum. From our examination of the record we find that there is evidence of market value but there is no evidence of the reasonable rental value of plaintiff's property, unimproved by defendants, for the period involved. There being no evidence of reasonable rental value, the judgment for damages of $5,400 is reversed.

■ The trial court also found, "Plaintiff has expended the sum of $6,000 for surveys, attorneys' fees, investigative fees, and has been damaged in the sum of $6,000 thereby" and the judgment entered included "6,000 damages for expenses." The defendants assign such an award of "damages for expenses" as error.

ORS 105.030 makes no provision for attorney fees or other expenses. Generally, the only expenses or attorney fees allowed are those specifically provided in ORS Chapter 20 or by contract between the parties. *Hollopeter v. Oregon Mutual Ins.,* 255 Or 73, 75, 464 P2d 316 (1970). In *Overton v. Blake,* 274 Or 91, 94, 544 P2d 1037 (1976), we held the expenses of making a

survey is not a proper disbursement unless the trial judge orders the survey. For these reasons the court erred and we are unable to determine proper costs and disbursements from the record.

Affirmed in part; reversed in part and remanded for further proceedings not inconsistent herewith.