Argued May 2, affirmed May 31, 1977

WHITLEY et al, *Appellants,*
*v.*
JACOBS et al, *Respondents.*
(TC L-3843, SC P-2496)

564 P2d 1057

John L. Jacobson, Baker, argued the cause for appellants. With him on the brief was Irving Rand, Baker.

Thomas F. Young, Baker, argued the cause for respondents. With him on the brief were Banta, Silven & Young, Baker.

Before Denecke, Chief Justice, and Howell, Bryson, Lent, Linde and Campbell, Justices.

CAMPBELL, J., Pro Tempore.

**CAMPBELL, J.,** Pro Tempore.

■ This is an action in ejectment, in which the plaintiffs seek to recover the possession of 116.19 acres of land. Trial was held before the court without a jury, and judgment was entered for the defendants. We must view the evidence in the light most favorable to the defendants, despite contradictory evidence offered by the plaintiffs. *Atlas Hotel Supply v. Baney,* 273 Or 731, 543 P2d 289 (1975).

Plaintiff Weitz claims ownership of the land in question by adverse possession. Plaintiffs Whitley are contract purchasers from Weitz. The defendants are the record owners.

The 116.19 acres are approximately five miles south of the Powder River and near Glascow Butte in Baker County. It is sagebrush land with scattered juniper and suitable chiefly for the grazing of livestock. The elevation is approximately 4,500 feet. The contour of the ground slopes downhill from south to north. There is one spring that has been developed to water livestock.

The land in question is irregular in shape. It was variously described by the witnesses as "rough triangle," "semicircle," "half-circle" and "half-moon." See the following sketch:

The plaintiff Weitz is the record owner of the land in Sections 19 and 20 adjoining to the south. Defendants Jacobs are the record owners of the 116.19 acres and the land adjacent to it in Sections 19 and 20 to the north and east.

In 1925 John P. Weller acquired the record title to all of the land in Sections 19 and 20 now owned by the Jacobses and Weitz. In the early 1930s Fred Phillips held the land under lease from Weller. In 1932 or 1933 Phillips had his men build a fence on an irregular

course along the east and north sides of the 116.19 acre tract now in dispute.[1] It was a four-strand barbed wire fence. There was testimony that Phillips built this fence to hold his cattle on the lower ground to the north during the spring of the year. It was described as a drift fence.[2]

In August 1939 Weller contracted to sell all of his holdings in Sections 19 and 20 plus other lands to the plaintiff Weitz and Richard Truscott. The deed to Weitz and Truscott as tenants in common was executed and recorded in September 1945. In February 1946 they exchanged deeds and divided their land. Truscott received the northern part and Weitz the south portion. It was divided along the north line of the SE ¼ of the SW ¼ and the S ½ of the SE ¼ of Section 19 and the SW ¼ of the SW ¼ of Section 20, Township 9 south of Range 44 east of the Willamette Meridian. Truscott became the record owner of what is now the Jacobses' property, including the "half-moon" 116.19 acres now in dispute.

At the trial of this case Weitz strenuously insisted that it was his and Truscott's intention to divide the property along the irregular fence line built by Phillips in the 1930s. Under this theory Truscott was to receive all land north of the fence and Weitz the land south of it including the 116.19 acres.[3]

Weitz, from 1946 until he sold to the Whitleys under contract in 1971, used the 116.19 acres in

<hr>

[1] The testimony is silent as to where Phillips fenced the west boundary of the tract. We do not know if the Phillips fence was originally a leg or a part of an enclosed pasture to either the south or the north.

[2] There are two Washington cases that deal with the question of adverse possession based on fences of convenience or drift fences: *White v. Branchick,* 160 Wash 697, 295 P 929 (1931), and *Lappenbusch v. Florkow,* 175 Wash 23, 26 P2d 388 (1933).

[3] The exchange deeds were prepared by the late Armand H. Fuchs, attorney at law, who practiced in Baker. It is interesting to note that Truscott and Weitz divided their land equally; each received record title to 480 acres. Although no two tracts of land are exactly alike, it would appear from the exhibits and testimony that all of the property was similar and of equal value.

conjunction with his other land to graze cattle. He, along with other people, repaired the fences. There was a 500-gallon water tank on the area in dispute located near the spring and used to water livestock. Weitz testified that he bought the tank, but the record is silent as to when.[4]

In July 1946 Truscott conveyed all of his property in Sections 19 and 20 to S. H. Coon, et al. In December 1949 the Coons conveyed to the Lews. In February 1960 the Lews conveyed to the Jeppesens. In December 1968 the Jeppesens conveyed to the Jacobses—the defendants. Each conveyance included the legal subdivisions in which the 116.19 acres are located. Nowhere in the chain of title is there a metes and bounds description that conveys or excepts the 116.19 acres. The metes and bounds description was prepared from a 1974 survey and first appears of record in the complaint in this case.

Three of the defendants Jacobs testified at the trial: Harry H., father, age 85; Clarence, son, age 65; and Ralph, son, age 55. They had all lived in that area of Baker County for a great many years and were well acquainted with the land in question. Weitz and the Jacobses had known each other for a long time. The Jacobses ran both sheep and cattle. Clarence, as a young man, was camped in the area with a band of sheep when Phillips built the fence. Weitz, on different occasions, had acknowledged to Harry H. and Ralph that the fence was not on the property line. Ralph had instructed their sheepherder to graze the 116.19 acres as the Jacobses knew that the fence was not on the proper line.

In the early 1970s the old fence built by Phillips had become too burdensome to maintain. The Jacobses tore down the fence. They hired a surveyor and rebuilt

---

[4] On the sole question of use, the trial court could have found that Weitz acted toward the land in question as would an average owner taking into account the geophysical nature of the land. *Springer v. Durrette,* 217 Or 196, 342 P2d 132 (1959); *Knecht v. Spake,* 218 Or 601, 346 P2d 98 (1959).

the fence on a line designated by the surveyor as the north line of the SE ¼ of the SW ¼ and the S ½ of the SE ¼ of Section 19 and the SW ¼ of the SW ¼ of Section 20. While rebuilding the fence they found evidence of the old original homestead fence along the surveyed line.

The plaintiffs have not paid the real property taxes on the land in dispute since the division of the property with Truscott in February 1946. Since that date the property has been assessed to Truscott and his successor in interest. *Volckers v. Seymour,* 187 Or 170, 173, 210 P2d 484 (1949), comments:

"* * * While payment of taxes is not essential to adverse possession, the failure to pay the same by a person claiming title by adverse possession is important evidence tending to refute such claim. *Phipps v. Stancliff,* 118 Or. 32, 245 P. 508; *Security Savings & Trust Co. v. Ogden,* 123 Or. 370, 261 P. 69; *Reeves v. Porta,* 173 Or. 147, 144 P. (2d) 493. As a general rule, a person pays taxes on that which he claims to own."

■ The plaintiffs have a heavy burden to establish ownership by adverse possession. The rule is set forth in *Reeves v. Porta,* 173 Or 147, 149, 144 P2d 493 (1944):

"Ownership of land by adverse possession can be acquired only by actual, open, notorious, hostile, continuous and exclusive possession under a claim of right or color of title. *Stephenson v. Van Blokland,* 60 Or. 247, 118 P. 1026; *Thomas v. Spencer,* 66 Or. 359, 133 P. 822. These elements must coincide, and the possession must be continuous for the statutory period, which, in this state, is ten years. 1 Am. Jur., Adverse Possession, section 126; Section 1-202, O.C.L.A. Where adverse possession is in issue, it is held generally that all of the elements thereof must be alleged, and must be established by clear and positive proof. *Laurance v. Tucker,* 160 Or. 474, 85 P. (2d) 374; *Enright v. Meves,* 142 Or. 88, 18 P. (2d) 216; *Houck v. Houck,* 133 Or. 78, 283 P. 25, 288 P. 213; *Chapman v. Dean,* 58 Or. 475, 115 P. 154; *McNear v. Guistin,* 50 Or. 377, 92 P. 1075; *Chastang v. Chastang,* 141 Ala. 451, 37 So. 799, 109 Am. St. Rep. 45; 1 Am. Jur., Adverse Possession, sections 238, 246."

■■ Here the trial court in a written decision held "the plaintiffs cannot prevail as they have not established the elements of adverse possession by a preponderance of the evidence."[5] It then entered findings of fact which included:

> "That all lands involved herein have been included within the U.S. public land surveys, and the boundary line between the legal subdivisions belonging to the plaintiffs and those owned by the defendant is a straight line running due East and West. The old fence line which marked the North boundary of the 116.19 acre tract involved here was not, and from its irregular character, running as it did in a rough half-circle, could not have been intended as a boundary fence separating the tracts of land belonging to the plaintiffs from those owned by the defendants. The fence in question which was originally built by Phillips, a lessee, was a convenience fence, constructed to assist in the management of cattle being grazed thereon, and not a boundary line fence designed to mark off the lines of the lands owned by his lessor. The chain of title, the history of the use, and all the other evidence presented at the trial all tend to undercut and discredit the contentions of the plaintiffs that their possession of the area in controversy was adverse, hostile and under claim of right or ownership. The reasonable inferences to be drawn from the evidence produced supports the contention of the defendants that this fence was not a boundary line established by an owner for the purpose of fixing the boundaries of his property, nor is there any reason to believe that the owner of plaintiffs' lands at the time the fence was erected by a lessee, was attempting to claim and assert ownership of any land that belonged to the then owners of the defendants' lands, as those lands are described by legal subdivisions in the various deeds and other instruments appearing of record."

We agree and affirm.

---

[5] The trial court also rejected plaintiffs' theory of "pure mistake" as to the location of the boundary line and therefore hostile intent would be presumed. *See Norgard v. Busher,* 220 Or 297, 349 P2d 490, 80 ALR2d 1161 (1960). *Almond v. Anderegg,* 276 Or 1041, 557 P2d 220 (1976).