NELSON et ux,
*Respondents/Cross-appellants,*
*v.*
VANDEMARR et ux,
*Appellants/Cross-respondents.*
(No. 35-551, SC 25025)

573 P2d 1232

Paul M. Reeder, Hillsboro, argued the cause for appellants/cross-respondents. With him on the briefs were Reeder & Rapp, Hillsboro.

John C. Hutchison, Oregon City, argued the cause for respondents/cross-appellants. With him on the briefs were Biggs, Hutchison & Hammond, Oregon City.

Before Denecke, Chief Justice, Howell and Bryson, Justices, and Gillette, Justice Pro Tempore.

BRYSON, J.

## BRYSON, J.

This suit involves title to a 20-foot by 1100-foot strip of land between lots 13 and 14, Garden Acres, a subdivision in Washington County. Plaintiffs own lot 14 and defendants own lot 13. The diagram that follows, not to scale, illustrates the area in controversy.

Day Road and all directions and distances shown on the diagram, except those in parentheses, are shown on the official plat approved April 18, 1911. The southwest corner of section 2 is not shown or identified on the official plat as filed.

A dispute arose between the parties about the location of the boundary line between their lots. Plaintiffs contended that line AB is the boundary; defendants, line CD, which is 20 feet south of line AB. Plaintiffs brought this suit pursuant to ORS 105.705 to 105.725 to determine the correct boundary line. For a separate cause of suit, plaintiffs alleged that they had acquired the border strip of land (described by points ABDC in the diagram) by adverse possession. The trial court held that line CD was the true boundary line, as contended by the defendants; however, the court granted part of the disputed strip used by plaintiffs as a "driveway" and that shown by the extended dotted line east of the driveway to plaintiffs by adverse possession. Both plaintiffs and defendants appeal from the decree. We review de novo.

It is first necessary to determine the true boundary line before we can consider the issue of adverse possession. Lots 13 and 14, from the time they were platted, have always been conveyed by lot number with reference to the plat and not by metes and bounds description within section 2. If the plat was unambiguous, it would determine the boundaries of the lots. *Templeman et al v. Leigh,* 130 Or 24, 29-30, 278 P 989 (1929). However, the plat is ambiguous because it does not show whether the subdivision ends at the south

line of section 2 or 20 feet north of that line. Ridder Street did not exist in 1911, when the plat was drawn. Also, for some reason, the platter did not show the south line of section 2 on the plat. The plat does show the distances from the center of Day Road to the south line of the subdivision, from which can be deduced the true southern boundary of the subdivision. However, the plat indicates that the distance from the center of Day Road to the south line of the subdivision is 3,066 feet on the west and 3,085 feet on the east, a difference of 19 feet.

If one accepts the western distance (3,066 feet), then the subdivision ends approximately 20 feet north of the south section line. In that case the western boundary of lot 14 would run 330 feet north of a point 20 feet north of the section line and line AB on the diagram would be the true boundary between lots 13 and 14 and plaintiffs would prevail. On the other hand, if one accepts the eastern distance (3,085 feet), then the subdivision ends approximately on the section line and defendants would prevail.[1] There is no way to tell from the plat which distance is correct. Therefore, we must consider other evidence to decide the issue.

■ The other evidence, as found by the trial court, favors the defendants' position. It appears that the original owners of the subdivision owned the entire western half of the western half of section 2.[2] Thus, for plaintiffs' theory of the boundary to be correct, the original owners must have intended to retain a 20-foot by 1,320-foot strip of land along the southern edge of the subdivision. There is nothing in the record to show that they did or why they would wish to do so.

---

[1]This assumes that the center of Day Road is parallel to the southern section line, which the evidence shows to be correct. Plaintiffs point out that the plat shows Day Road to be not quite parallel to the southern section line.

[2]These original owners sold some of the northern part of this parcel but kept the southern part.

[ 69 ]

Plaintiffs suggest that the original owners left the strip out of the subdivision for road purposes. However, the evidence shows that when the original owners intended to reserve a strip of land along the western edge of the subdivision for road purposes (Garden Acres Road), they indicated this intent by leaving a space between the western side of the lots and the section line and they showed the section line. There is no such reserved strip indicated along the southern edge of the plat. Further, the neighborhood petition for Ridder Street was not filed until 1912, one year after the official plat was drawn and filed.

Since there is no indication that the original owners intended to stop the subdivision short of the section line, and since we have adopted a policy against construing conveyances so as to create "strips of land the title to which would otherwise remain in abeyance for long periods of time," *Hurd v. Byrnes,* 264 Or 591, 598, 506 P2d 686 (1973), it follows that the subdivision should be construed as extending to the south section line.

There is also evidence of old fences that supports this conclusion. In *Bernitt v. City of Marshfield,* 89 Or 556, 562, 174 P 1153 (1918), we said:

"* * * In construing, interpreting or resurveying an old map or plat, old fences, street improvements, lines of occupancy, etc., showing that the territory had for a long time been occupied under an evident and consistent survey of such plat, are strong evidence of the location of the original lines * * *."

There is an old fence running along the easterly part of the boundary shown as CD (running approximately 300 feet along line CD). In addition, a survey of the other fences in the subdivision, the locations of which are relevant under *Bernitt,* reveal that five out of seven fences were within four feet of where defendants' theory would put them, and one was within six feet.[3]

[3]The seventh fence was 23 feet south of where defendants' theory would put it, but this is no help to plaintiffs because the fence is *43* feet south of where plaintiffs' theory would put it.

It would serve no purpose to discuss the other evidence, but we have reviewed it in its entirety together with plaintiffs' contentions. We find, as did the trial court, that line CD is the true boundary between lots 13 and 14.

■ Both parties also alleged ownership by adverse possession. The trial court found that plaintiffs had established ownership of part of defendants' land by adverse possession, and defendants appeal. The court awarded plaintiffs what are in fact two parcels, and we discuss them separately. Before we review the facts, we note that plaintiffs had the burden to prove that their possession was "actual, open, notorious, hostile, continuous, and exclusive, under a claim of right or color of title, for a period of ten years." *Grimstad v. Dordan,* 256 Or 135, 139, 471 P2d 778 (1970); *Beaver v. Davis,* 275 Or 209, 211, 550 P2d 428 (1976); ORS 12.050.

The first parcel that plaintiffs acquired by adverse possession is the driveway that runs adjacent to and north of line CD (as shown on the diagram) from Garden Acres Road to the east side of a barn on plaintiffs' land.[4] Several of plaintiffs' witnesses testified that the driveway had been continuously and exclusively used by plaintiffs' predecessors in title. One of these witnesses testified that the driveway had been there and so used since the mid-1930's. Plaintiffs purchased and moved on the property in 1962 and have continuously used the driveway to the east side of the barn since that time. Further, plaintiff Nelson testified:

"Q   Maybe you could just tell us, Mr. Nelson, what you claim and have claimed as being the boundary between your property and the Vandemarr property.

"A   Well, what I claimed and I have always claimed since I have owned the property, was the driveway,

---

[4]This parcel, it seems, was the cause of this lawsuit. Plaintiffs tried to sell the western part of their lot to a couple named Bradshaw. When the Bradshaws learned of the boundary dispute between plaintiffs and defendants, they refused to sign the papers to complete the transaction. Plaintiffs then filed this suit.

[ 71 ]

always the driveway, and then anything north of that to where the true line might be.

"THE COURT: And anything ——

"THE WITNESS: But the driveway, regardless of where the true line is at."

■ The evidence was sufficient to make a prima facie case of adverse possession of the driveway. Defendants assert that plaintiffs' use of the land originated in permission from defendants and that plaintiffs' use of the land was not "actual, hostile, or exclusive."

Defendants' evidence of permission was given by defendant Vandemarr as follows:

"Q * * * Subsequent to that and after Mr. Nelson moved onto his property did you ever have any conversation with him in regards to this fence that we have been calling the temporary fence?

"A Yes, I did.

"Q Approximately when was this?

"A The first conversation that I had with him was shortly after they moved in. They were going to buy a beef animal and he and his father-in-law were fencing in the area of the barn, and Mr. Nelson asked me if he could use my east and west fence. You understand, to keep from building a double fence.

"I said, 'Yes, you can, but it's not on the line; it's a temporary fence. The line is several feet farther south,' but to go ahead and use the ground.

"Mr. Nelson's father-in-law was helping him, and I still remember that. He said, 'Well, where do you think the line is, about 30 feet over here?'

"That was all of that.

"Q That was the end of that conversation?

"A Yes.

"Q But you did tell him that he could use the ground?

"A Yes, I did.

"Q Okay."

■ This testimony does not defeat plaintiffs' claim. Such permission would apply only to the area where the "beef animal" was to be kept. This area did not

include the driveway. In addition, Mr. Nelson's father-in-law's answer to defendant could well be taken as a rejection of defendant's claim of ownership; in fact, defendant Vandemarr later testified that he "ignored the remark for the sake of harmony." The father-in-law's remark refutes defendants' assertion of permissive use and supports plaintiffs' assertion of adverse use. Further, even if defendants attempted to give plaintiffs permission to use the driveway, it appears that the driveway had been used since the mid-1930's and before plaintiffs occupied the property, including the driveway. Plaintiffs' predecessors had already continuously and exclusively occupied the driveway for more than the required 10-year period of time. We are satisfied that the use of the driveway by plaintiffs and their predecessors up to that time was sufficient to establish plaintiffs' ownership in the driveway by adverse possession.

Defendants' assertions that plaintiffs' use of the driveway was not "actual" or "hostile" are clearly wrong. Defendants also assert that plaintiffs' use was not exclusive. Defendants testified, and plaintiffs agreed, that defendants had occasionally come on the driveway to prune some apple trees that grew on the north side of the driveway. However, plaintiff Nelson testified:

"Q   Okay, what part of the driveway did he [defendant] use?

"A   The same part of the driveway that everybody else used.

"* * * * *.

"Q   Did you ever protest that?

"A   No.

"Q   Why not?

"A   Well, because I don't protest anybody using my driveway * * *. I have no way of determining exactly where the true line is at, so at that time I assumed that maybe the fruit trees are on his property, and we have no use for them.

"Q   So you didn't object to him using your driveway,
like anyone else, to get to the trees?
"A   No."

We have held that "exclusive" does not mean
absolutely exclusive, but only such use as would be
"expected of an owner under the circumstances."
*Grimstad v. Dordan, supra* at 141. Allowing a neigh-
bor on one's driveway for the purpose of pruning trees
is just the sort of use one would expect. Therefore, this
evidence does not negate the element of exclusiveness.
In *Norgard et al v. Busher et ux,* 220 Or 297, 308, 349
P2d 490 (1960), a case similar in aspects, we stated,
"The claimants' possession need not be absolutely
exclusive; it need only be a type of possession which
would characterize an owner's use." We therefore find,
as did the trial court, that plaintiffs' continuous and
open use of the area described as the driveway was
sufficient to make out a title by adverse possession in
plaintiffs.

However, we disagree with the trial court's deter-
mination that plaintiffs acquired the property (shown
by dots on the diagram) east of the barn between the
true line (CD on the diagram) and the temporary fence
by adverse possession. In *Norgard et al v. Busher et ux,
supra,* we stated:

"Where an occupant of land is in doubt as to the
location of the true line it is reasonable to inquire as to
his state of mind in occupying the land in dispute. If,
having such doubt, it was his purpose to hold the
disputed area only if that area was included in the land
described in his deed, then it is reasonable to say that the
requisite hostility is lacking. But, if the occupation of the
strip is under a mistaken belief that it is included in the
description in his deed (a state of mind sometimes
described as 'pure mistake' to distinguish it from the
cases of 'conscious doubt'), then his possession is adverse.
* * *"

It clearly appears from the record that this is a case
of "conscious doubt," not one of "pure mistake," as
regards the land east of the barn. Plaintiff Nelson

testified that he did not know where the true line was in that area and that he knew that the fence was not on the line. His intent with respect to this parcel is revealed by the following testimony:

"Q Now, Mr. Nelson, we have talked about your intentions regarding the driveway, et cetera; what about your intentions regarding ownership of property back where there was no driveway, per se?

"A Well, the part in the furthest back would be wherever the true line was at. *In other words, I would intend to claim where the true line was at,* which would differ from the property on the front. In other words, whenever the line is determined, that's where I would own to, the true line.

"* * * * *.

"THE WITNESS [Plaintiff Nelson]: The way I see it was that to the east of the barn the fence is crooked, and *the true line would maybe be determined at some date, and that's where I'd claim to, would be the true line,* wherever that might be." (Emphasis added.)

From this testimony we conclude, following *Norgard,* that "it is reasonable to say that the requisite hostility is lacking."

We therefore find that the decree of the trial court should be modified to show that the land acquired by plaintiffs by adverse possession includes only the driveway running up to the east side of plaintiffs' barn. The case is remanded to the trial court for entry of a decree in accordance with this opinion and to establish the description of the "true location of the disputed boundary * * * upon the land of the parties and establish and mark out upon the grounds, by proper marks and monuments, the boundary" as provided in ORS 105.715, 105.720 and 105.725.

Affirmed, modified and remanded for further proceedings.