Argued April 5, affirmed May 16, 1978

TERRY, *Appellant,*
*v.*
TIMMONS et ux, *Respondents.*
(No. 76-106 L, SC 25331)
578 P2d 405

Douglas V. Osborne, Klamath Falls, argued the cause and filed the brief for appellant.

Quentin D. Steele, Klamath Falls, argued the cause and filed the brief for respondents.

Before Denecke, Chief Justice, Tongue and Linde, Justices, and Joseph, Justice Pro Tempore.

JOSEPH, J., Pro Tempore.

**JOSEPH, J.,** Pro Tempore.

This case involves conflicting claims of title to a triangular tract of land comprising .67 acres. Plaintiff filed a complaint against defendants for trespass and asked for damages in the amount of $12,081 because defendants had cut down some trees on the tract. ORS 105.810. Defendants' answer denied plaintiff's allegations and alleged a countersuit to quiet title on the theory that they had acquired ownership by adverse possession. The trial court found for the defendants and quieted title in them. The issue is whether the evidence is sufficient to establish all of the elements necessary for the acquisition of title by adverse possession.

In order to prove a title by adverse possession, defendants have to establish by clear and positive proof that they have had actual, open, notorious, exclusive, continuous and hostile possession for the full statutory period of 10 years under claim of right or color of title. *Beaver v. Davis,* 275 Or 209, 211, 550 P2d 428 (1976); ORS 12.050.

The following sketch illustrates the area involved:

The evidence shows that in 1942, John P. Fallon acquired title to approximately 102 acres of marsh and timberland which includes all of the land owned by plaintiff and all of the land owned by defendants in this proceeding, including the triangular tract. In 1942, Fallon put a fence along the north, west and south sides of a southerly portion of his land. (The eastern side is bounded by marshland.) The fence was described as a "pigwire" fence with two barbed wires on top. In 1945, Fallon conveyed 22.11 acres by deed to plaintiff's parents. In 1956, Fallon conveyed 35 acres by deed to defendants. Both deeds contained section, township and range descriptions.

When defendants bought their land, the pigwire fence was still standing, and they testified that Fallon told them that the north fence marked the northern boundary of their land. Actually, the northwest corner of the fence is very close to the northwest corner of the tract in their deed description; however, the fence then angles northeast onto land which is included in plaintiff's deed description. Defendants had their west boundary surveyed because Fallon had told them that the west fence was not on the boundary.

Defendants testified at length as to how the disputed land has been used. They said that Fallon pastured horses and sheep on the land while he owned it and had also seeded grass on the property at one time. When defendants purchased the land in 1956, they permitted Fallon to continue living on the land, keeping things in order and taking care of it for them until 1963. In 1958, defendants started building a home on property south of the triangle. They came to their property every day after that except when they were on vacation. In 1958, defendants also began letting various people pasture horses on the land in the summer while the grass was up, a practice which continued without substantial interruption until 1973. The horses often grazed in the disputed area where the best grass was near the fence. Defendants meanwhile

maintained the entire fence to keep the animals in. That involved checking the fence in the spring and putting in an occasional post, staple or stretch of wire. In 1965, they moved into the home they had built. In 1967, they harrowed a portion of the disputed area and planted grass seed. They testified that when they purchased the land in 1956, they intended to own and occupy the land up to the north fence, that the north fence marked the only boundary they ever knew, that they believed that the disputed area was their land and that they thereafter treated the disputed areas the same as the land described in their deed. They said they never actually knew their deed did not encompass the area.

Plaintiff's evidence shows that her father worked closely with Fallon in the early 1940's and possibly had some claim to an interest in the land before any was deeded to him in 1945. She visited the land often between 1944 and 1945 and she also viewed it with her husband-to-be in 1946. She testified that she always knew that the north fence did not mark the boundary of her land because the fence was built before the land was sold. She, and her husband, acknowledged that access to the area either required going across the fence or crossing defendants' deeded land.

In 1947, plaintiff's father died, and plaintiff's mother became the sole owner of the property until she conveyed it to plaintiff in 1971. There is no evidence that plaintiff, her mother or any of her family had any contact with the land, other than paying taxes on it, from 1947 until 1965. Plaintiff visited the land on one day in each of the years 1965, 1969, 1971 and 1975. During the 1969 visit, plaintiff and her husband walked the boundary described in the deed with a compass and found an old survey pin. At no time did they make any comment to defendants about the fence until 1975, although they did from time to time ask permission to cross their land without, so far as the record shows, even saying why they wanted the

permission. There is no evidence of any recorded survey at that time.

In 1975, plaintiff noticed that defendants had logged trees which she believed were on her land. At this point, plaintiff contacted a lawyer and also had the property surveyed. The survey revealed that the boundary described in the deed was actually south of the old north fence and was close at one point to the old survey pin. When plaintiff discussed the matter with defendants, defendants stated that they would not fight over a few inches but they objected to moving the fence.

On October 25, 1975, plaintiff's husband wrote to defendants requesting reimbursement for the value of the trees removed and the fee for appraising the trees. In July, 1976, after filing her complaint, plaintiff moved the old north fence and put in a new fence on the surveyed line which corresponds to the line in the deed description.

■ Plaintiff contends that the evidence is not sufficient to establish that defendants acquired the property by adverse possession. We have examined all of the evidence, and we disagree.

Defendants testified that from the date of their purchase, they intended to own the land up to the north fence and that they were claiming that land even in the event that Fallon had incorrectly designated the north fence as the boundary. There was no evidence that showed any other state of their minds. Therefore defendants possessed the land under a claim of right and in a hostile manner from 1956 to the present. *See Grimstad v. Dordan,* 256 Or 135, 140, 471 P2d 778 (1970); *Norgard v. Busher,* 220 Or 297, 303, 349 P2d 490 (1960).

■ That cattle from neighboring land occasionally found their way through the fence to the area claimed by defendants does not render their possession non-adverse. The requirement of exclusive possession is

satisfied by such use as would be expected of an owner under the circumstances. *Nelson v. Vandemarr,* 281 Or 65, 74, 573 P2d 1232 (1978); *Grimstad v. Dordan, supra,* at 141. Defendants assert, and the photographs demonstrate, that the fence was in generally good condition. They actively maintained it in a manner consistent with the nature and use of the land. *Cf., Reeves v. Porta,* 173 Or 147, 153, 144 P2d 493 (1944) (fence not complete or maintained). There is persuasive evidence that defendants intended to and did maintain exclusive possession of the land. *See Norgard v. Busher, supra,* at 308-09.

■  Defendants' possession was also actual, open and notorious. Defendants permitted their friends to hunt in the disputed area nearly every year. Further, they continuously referred to the north fence as their boundary. The evidence is very strong that they were well understood in the area to claim all of the land south of the fence. From 1958 to 1973, defendants permitted people to pasture horses on the land. The pasturing of animals on timberland may, under proper circumstances, satisfy the requisite elements of actual, open and notorious possession. *See Norgard v. Busher, supra,* at 305. In this case, where the land was primarily timber, grazing, brush and marsh land, where the fence was maintained and visible, and where the grass was seasonal, regular pasturing of the horses was sufficient to put the true owner on notice of another's actual, open and notorious possession.

■  The fact that the horses grazed upon the land for only a few months each year did not break the continuity of defendants' claim. Defendants were only required to use the land as an average owner of the particular type of land would use it, even though that use might have permitted intervals in which the land was not used at all. *Springer v. Durrette,* 217 Or 196, 201, 342 P2d 132 (1959). In this case, the land was not irrigated and there was only enough grass for horses to graze for those few months. Under the circumstances,

[ 369 ]

defendants' use of the land was actual, open and notorious, exclusive, continuous and hostile from 1958 to 1973—well beyond the statutory requirement of 10 years.

Affirmed.