DICK FELIX, INC.,
*Respondent - Cross-Appellant,*

*v.*

GILLETTE,
*Appellant - Cross-Respondent,*
GILLETTE,
*Appellant - Cross-Respondent.*

GILLETTE et al,
*Appellants - Cross-Respondents,*

*v.*

HICKMAN et al,
*Respondents - Cross-Respondents.*

(No. 78-12-339, CA 19986)

646 P2d 629

Katherine H. O'Neil, Portland, argued the cause for appellants - cross-respondents. With her on the briefs were Daniel F. Knox and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Dennis H. Elliott, Portland, argued the cause for respondent - cross-appellant. On the brief were Sandra Campbell-Stout and O'Connell, Goyak & Ball, P.C., Portland.

Margaret H. Leek Leiberan, Portland, argued the cause for respondents - cross-respondents. With her on the brief was Lang & Smith, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

## ROSSMAN, J.

This case involves an alleged timber trespass and conflicting claims of title to a 3.25-acre tract of land in Clackamas County. The trial court awarded plaintiff (Felix) double damages for timber trespass, dismissed defendant's (Gillette) counterclaim to quiet title in him and his wife[1] on the basis of adverse possession by their predecessors in title and found against defendant and his wife on their third-party complaint for indemnity against their predecessors in title. The court also found against the third-party defendants (the Hickmans and McCagues) on their counterclaims to quiet title and for timber trespass.

The Gillettes appeal, seeking (1) reversal of the trial court's judgment in the trespass action and its ruling on their counterclaim to quiet title and (2) a reformation of the "Hickman/McCague-Gillette deed" to reflect their ownership of the disputed tract. In the alternative, the Gillettes request the court to "use its equitable powers to grant the Gillettes indemnity against the Hickmans/ McCagues." Felix cross-appeals, assigning error to the trial court's failure to award treble damages. The Hickmans and McCagues do not appeal.[2] We reverse and remand.

Felix is the record owner of the property in dispute. It was part of a 39.5-acre tract Felix purchased in 1977 from the Pecks, owners since the 1940's. The Pecks and, thereafter, Felix paid the taxes on the property; however, no one has ever lived on the land, and it remains unimproved. To the north of the Felix property lies a 80.9-acre tract, purchased by the Gillettes from the Hickmans and McCagues in 1978. The Hickmans and McCagues acquired the parcel from the Burglands in 1960. A third tract, of

---

[1] Intervenor and third-party plaintiff.

[2] The Hickmans and McCagues have not appealed from the judgment of the trial court against them on their counterclaim to quiet title to the disputed strip in them. As respondents - cross-respondents on appeal, the Hickmans and McCagues state that they "accept appellants' argument on assignment of error number 1," and that they "agree with appellant that the unrefuted evidence at trial clearly revealed the Hickmans and McCagues acquired title by adverse possession to all the land bounded by their fences years prior to the sale to the Gillettes." The Gillettes first assign error to the trial court's dismissal of their counterclaim to quiet title. As part of the argument on that assignment, the Gillettes contend that they, not the Hickmans and McCagues, now own the disputed strip, because the Hickmans and McCagues intended to and did transfer to them whatever title they had in the "disputed strip" at the time of the sale of the 80.9-acre tract.

some significance here, lies west of the Felix property and is now owned by Pires.

The Hickmans and McCagues, and later the Gillettes, believed when they purchased the northern parcel that an existing fence marked the southern boundary between their property and the Felix property. Actually, the fence was 45.65 feet south of the record boundary at its eastern end and 142.6 feet south of that line at its western end, where the fence meets the eastern border of the Pires property and turns north. The 3.25 acres between the fence and the record boundary of the Gillette and Felix parcels is the area in dispute. A fence running north and south divides the meadowland of the eastern portion of the disputed tract from the timberland of the western portion. The fence bordering the meadowland on the south is a substantial rail fence; bordering the timberland on the south and west is a barbed-wire fence. A road through the eastern portion of the disputed tract provides access to the Gillette property. The following sketch illustrates the area included (the circled A designating the timberland and the circled B designating the meadowland):

The Burglands had originally developed their property as a country estate, with a substantial "main house," a caretaker's cottage, a barn and a storage shed. Apparently, the fence bordering the disputed tract was installed during their tenure. The McCagues lived in the "main house" for some months immediately following purchase. Thereafter, neither the McCagues nor the Hickmans lived on the property; however, the Hickmans spent virtually "every weekend" in the main house and stayed for several weeks there during summers. Caretakers lived in the cottage on the property year-round during 16 of the 18 years the Hickmans and McCagues owned the parcel.

During the first 14 years of ownership, the Hickmans and McCagues kept the fence bordering the disputed tract "tight" and in good repair. The regular maintenance of the fence involved replacing barbed wire and fence posts or boards. During that same period, up to 40 head of cattle grazed on the property. In the spring and summer, the cattle roamed the entire parcel. They "gravitated toward the pasture areas," including the meadowland in the disputed tract. The Hickmans and McCagues periodically reseeded these pastures and planted and harvested hay in the meadowland. They also "limed," "disked," and fertilized that portion of the disputed tract, as they did other portions of the "south pasture." When the grass had been "eaten down," the cattle grazed in the parcel's timberland, including that in the disputed area, where there was pasture underneath the trees. The cattle grazed along the barbed wire fence bordering that area on the south, leaving trails along the fence and "cow pies * * * all over." During the winter months, the cattle were kept near the barn and fed hay and grain.

The Hickmans and McCagues had used and maintained the road that led through the disputed area to the "main house." They had also harvested timber from the western portion of that tract on two occasions. In 1962, they logged "a few thousand feet," and in 1973, timber in that section was thinned almost to the fence line. In addition, the Hickmans and McCagues and their caretakers sprayed both the wooded and meadowland portions of the disputed tract for tansy approximately twice yearly.

In 1978, the Hickmans and McCagues sold their property to Gillette, who intended to log it. He testified that the fences bordering the disputed tract were represented to him as being the southern boundary of the parcel. Also in 1978, approximately one year after his purchase of the Pecks' property, Felix directed the removal of part of that fence and had "blazes" painted on trees in the western portion of the tract to mark what was, according to Felix, the correct southern boundary of the Gillettes' property. At about this same time, Gillettes' crews began cutting timber in the area.

■ In order to prove a title in their predecessors by adverse possession, the Gillettes have to establish by clear and positive proof that the Hickmans and McCagues had actual, open, notorious, exclusive, continuous and hostile possession for the full statutory period of ten years under claim of right or color of title. *Terry v. Timmons,* 282 Or 363, 365, 578 P2d 405 (1978); ORS 12.050. Our review is *de novo. Nedry v. Morgan,* 284 Or 65, 584 P2d 1381 (1978); ORS 19.125(3); ORS 105.605. Felix contends that there is insufficient evidence to establish such ownership. We disagree.

(a) *Hostility*

■ ■ During the 18 years of their ownership, the Hickmans and McCagues believed, albeit mistakenly, that the fence was the actual southern boundary of their property. They intended to and did claim and use the land up to that fencing as their own.[3] As stated by the trial court:

> "I am convinced from the evidence in this case that Mr. Hickman intended to convey *all* the property [to Gillette] and I think he believed that he did *own* up and to the fences." (Emphasis added.)

The Hickmans and McCagues possessed the disputed tract under a claim of right and in a hostile manner for the

---

[3] Felix and his predecessors paid property taxes on the disputed tract. Failure by Gillette and his predecessors to pay such taxes is evidence against the claim of adverse possession, although not conclusive. *Reeves v. Porta,* 173 Or 147, 156-57, 144 P2d 493 (1944). Gillette contends that he and his predecessors *did* pay taxes on the *timber* in the area. There was testimony suggesting that the Department of Revenue may not have assessed Felix for the full value of trees in the disputed area because of assumptions concerning the boundary line made by those conducting timber cruises of the area.

statutory period. *See Terry v. Timmons, supra; Norgard v. Busher,* 220 Or 297, 303, 349 P2d 490 (1960).

Felix argues that the fencing was placed south of the true boundary for convenience rather than to establish a property line, citing *Lappenbusch v. Florkow,* 175 Wash 23, 26 P2d 388 (1933).[4] Felix admits that "there is no direct evidence on *why* the fence was built," but he contends that topography and not intent to establish a boundary determined the placement of the fence. Assuming that the doctrine of "convenience fences" exists in Oregon, we find that principle is not dispositive here.[5] The purpose for which the fence was originally installed is unknown, although Felix contends its purpose may be inferred from its character. The Hickmans and McCagues did not build the fence, but, following their purchase of the property, they maintained the fence and treated the land bounded by it as their own. We also find no merit in Felix's contention that Hickman's agreement during a 1977 telephone conversation with Felix to fly over the property to reach an "understanding of where the property line was" is inconsistent with the required hostile intent. *See Grimstad v. Dordan,* 256 Or 135, 140-41, 471 P2d 778 (1970).

---

[4] In addition to concluding that "[t]he [irregular] fence taken as a whole lacks every element of a deliberate attempt to define a boundary," the court in *Lappenbusch* also found it significant that the claimant gave no indication to the true owner through his use of the disputed property that he regarded it as a "line fence." As the court stated: "The hostile flag of an adverse claim was never unfurled." *Lappenbusch v. Florkow, supra,* 175 Wash at 28. This is *not* the case here. *Compare Grimstad v. Dordan,* 256 Or 135, 471 P2d 778 (1970).

[5] The court in *Whitley v. Jacobs,* 278 Or 541, 564 P2d 1057 (1977), affirmed the trial court's conclusion that the plaintiffs had not established ownership to a tract of land in eastern Oregon by adverse possession. The Supreme Court held that the evidence supported a finding that a fence erected by the lessee of a prior owner and not following the boundary described by deed was not intended as a boundary fence. The plaintiffs' predecessors in title used the disputed tract to graze cattle, used a water tank on the tract to water the cattle, and, with others, repaired the fences. There was testimony that the lessee built this fence to hold his cattle "on the lower ground to the north during the spring of the year." It was described as a "drift fence" and was in the shape of a "rough half-circle." The trial court found and the Supreme Court agreed that:

"The chain of title, the history of the use, and all other evidence presented at the trial all tend to undercut and discredit the contentions of the plaintiffs that their possession of the area in controversy was adverse, hostile and under claim of right or ownership." 278 Or at 548.

### (b) *Exclusivity*

The requirement of exclusive possession is met by such use as would be expected under the circumstances. *Terry v. Timmons, supra,* 282 Or at 369. The Hickmans and McCagues and their employes maintained the fences bordering the disputed tract in a manner consistent with their use of the land for the statutory period. *See Norgard v. Busher, supra,* 220 Or at 307-08.

### (c) *Continuity*

The possession of the disputed tract by the Hickmans and McCagues was continuous during the statutory period. Again, they were required to use the land only as average owners would use it, even though such use permitted intervals in which the land was not used at all. *Springer v. Durrette,* 217 Or 196, 201, 342 P2d 132 (1959). Grazing of cattle, maintenance of the fences and spraying for tansy, all followed a regular pattern. Taking timber and planting hay in the meadow occurred as the need arose. Such use constitutes more than the "intermittent and disconnected acts of trespass" found in *Reeves v. Porta,* 173 Or 147, 153, 144 P2d 493 (1944), and in our opinion satisfies the requirement of continuity.[6] *See Terry v. Timmons, supra,* 282 Or at 369-70.

### (d) *Actuality, Openness and Notoriety*

The possession by the Hickmans and McCagues was also actual, open and notorious. Felix contends that the following rule, stated in *Reeves v. Porta, supra,* 173 Or at 153, and cited with approval in *Miller v. Bushnell,* 275 Or 45, 49, 549 P2d 655 (1976), controls in this case:

" * * * The occasional pasturing of cows upon a piece of brushy wilderness is not enough to put an owner upon notice that his title is being challenged by adverse possession, and we think that this is particularly true when, as in this case, the owner is nonresident."

The principle stated does not decide the question here. For approximately 14 years the Hickmans and McCagues raised cattle on their property. In the spring, summer and fall the cattle roamed the entire parcel, gravitating to the

---

[6] *Compare Miller v. Bushnell,* 275 Or 45, 48-49, 549 P2d 655 (1976).

pasture areas that included the disputed meadowland. When they had "eaten down" the grass in the pastures, the cattle grazed in the parcel's timberland, including that in the disputed tract, leaving trails and "cow pies" along the bordering fence. During the period the Hickmans and McCagues raised cattle, they maintained the fence. Such use was sufficient to establish an actual, open and notorious possession. *See Terry v. Timmons, supra,* (decided after *Miller v. Bushnell, supra).*

The use of the disputed tract by the Hickmans and McCagues was actual, open and notorious, exclusive, continuous and hostile from 1960 until at least 1973 — beyond the statutory requirement of ten years. The Gillettes, through their predecessors in title, acquired ownership of the disputed tract.

We reverse the judgment of the trial court in favor of Felix in the timber trespass action and remand with instructions to enter judgment quieting title to the disputed tract in the Gillettes; the judgment is otherwise affirmed.