2008 WY 111.

**Edmond A. COOK, Appellant (Plaintiff),**

v.

**Ivan EDDY, Appellee (Defendant).**

No. S–07–0272.

Supreme Court of Wyoming.

Sept. 23, 2008.

707

Representing Appellant: James A. Eddington, Torrington, Wyoming.

Representing Appellee: Frank D. Peasley, Douglas, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] After a bench trial, the district court quieted title to approximately 40 acres of Edmond A. Cook's land to Ivan Eddy. Mr. Cook appeals, claiming the district court erred by ruling that Mr. Eddy had acquired title to the property by adverse possession.

[¶ 2] We affirm.

### ISSUES

[¶ 3] Mr. Cook presents the following issues on appeal:

1. Were the trial court's findings of fact, specifically that the fence was not a fence of convenience, clearly erroneous or contrary to the great weight of the evidence?
2. Did the trial court [err] in concluding that each and every element of adverse possession was proved by Appellee?

Mr. Eddy's statement of the issues is substantially the same.

### FACTS

[¶ 4] Mr. Eddy and Mr. Cook own adjoining mountainous properties in Niobrara County. The boundary between their properties was the township line between Town-

ships 33 and 34 North, Range 62 West. The fence that separated the properties did not follow the east-west township line; it was north of the line and, accordingly, enclosed 40.44 acres of Mr. Cook's land inside Mr. Eddy's pasture. Mr. Eddy has used the disputed property for grazing his cattle since he contracted to purchase his property in 1988.

[¶ 5] In 1999, Mr. Cook apparently had the property line surveyed and later began building a fence along the line. Mr. Eddy objected, and in 2004, Mr. Cook filed a petition for a temporary restraining order and injunction to prevent Mr. Eddy from interfering with his efforts to relocate the fence. Mr. Eddy filed a counterclaim seeking to have title to the disputed property quieted to him. Although the parties reached an agreement regarding the restraining order and injunction, the district court conducted a bench trial on Mr. Eddy's adverse possession counterclaim. After the trial, the district court entered findings of fact and conclusions of law ruling that Mr. Eddy had established his adverse possession claim and quieted title in his favor. Mr. Cook appealed.

## STANDARD OF REVIEW

[¶ 6] We review the district court's decision following a bench trial by applying the following standards:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006) (citations omitted). *See also, Addison v.*

*Dallarosa–Handrich,* 2007 WY 110, ¶ 8, 161 P.3d 1089, 1091 (Wyo.2007). With regard to the trial court's findings of fact,

> we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

*Mullinnix,* ¶ 12, 126 P.3d at 916 (citations omitted). The district court's conclusions of law, however, are subject to our *de novo* standard of review. *Id.*

## DISCUSSION

[¶ 7] The elements of an adverse possession claim are well-known. " 'In order to establish adverse possession, the claiming party must show actual, open, notorious, exclusive and continuous possession of another's property which is hostile and under claim of right or color of title.' " *Addison,* ¶ 11, 161 P.3d at 1091, quoting *Gillett v. White,* 2007 WY 44, ¶ 15, 153 P.3d 911, 915 (Wyo.2007). The adverse possession must continue for at least ten years. Wyo. Stat. Ann. § 1–3–103 (LexisNexis 2007).

> When there is no clear showing to the contrary, a person who has occupied the land for the statutory period, in a manner plainly indicating that he has acted as the owner thereof, is entitled to a presumption of adverse possession; and the burden shifts to the opposing party to explain such possession. However, if a claimant's use of the property is shown to be permissive, then he cannot acquire title by adverse possession.

*Addison,* ¶ 11, 161 P.3d at 1091–92, quoting *Gillett,* ¶ 15, 153 P.3d at 915 (citation omitted).

[¶ 8] Mr. Eddy purchased his property in 1988. He testified that he occupied the disputed land each year by allowing his cattle to graze it and using it to access another pasture. Mr. Eddy stated that annually he posted all of his exterior fences, including the fence at issue here, with "no trespassing"

signs. When Mr. Cook's cattle strayed onto the disputed property, Mr. Eddy moved them back onto Mr. Cook's land on the north side of the fence. Based on that evidence, the district court concluded that Mr. Eddy was entitled to a presumption of adverse possession and the burden shifted to Mr. Cook to explain Mr. Eddy's possession of the property.

 [¶ 9] Mr. Cook attempted to meet his burden by establishing that Mr. Eddy's use of the disputed property was permissive because the fence was built off line as a matter of convenience. Although "enclosing land within a fence is sufficient to 'raise the flag' of adverse possession, ... a fence kept simply for convenience has no effect upon the true boundary between tracts of land because, unlike a boundary fence, a fence of convenience gives rise to permissive use and permissive use will not support a claim for adverse possession." *Addison,* ¶ 12, 161 P.3d at 1092, quoting *Gillett,* ¶ 15, 153 P.3d at 915. The question of whether a fence is one of convenience or establishes a property boundary is one of fact. *Id.*

 [¶ 10] The evidence presented at trial[1] established that the township line had been demarcated by monuments since approximately 1883. The fence, which did not follow the township line, had been in place for many years prior to Mr. Eddy's ownership of his property. The district court found:

22. The correct boundary between the parties' propert[ies] (the corner between section 34, 35, 3 and 2) was surveyed and marked in 1883. There is an old path or corridor cleared along the correct boundary.

23. The fence departs severely from the [property] boundary, running Northeast, at its East end. It then angles Northwesterly, and finally turns to the West Southwest and runs back to the correct boundary line. It is obvi-

ous that the fence departs from the correct boundary line both at its West end and at its East end.

24. The fence runs in 3 straight sections: Northeasterly, then Northwesterly, and finally West–Southwesterly. Although there are small deviations within those straight sections to accommodate trees or rocks, the route and 3 sections are straight.

25. The Northeast section of the fence may not have been an original part of this fence only, but was part of a longer North–South fence.

26. In general, the route of the fence is across as irregular of terrain as the route of the correct boundary. In places each route is steeper or rougher than the other.

Based upon these findings, the district court concluded the fence was a boundary fence and not a fence of convenience.

[¶ 11] Mr. Cook attempted to prove that the fence was one of convenience because it traversed less rugged terrain than the township line. He testified that the fence missed some areas of significant changes of elevation found on the township line and it was, therefore, easier to build than if it had been placed on the boundary. He called Marvin Schlup, a land surveyor, as a witness. Mr. Schlup testified that the fence looked like a fence of convenience to him because "it looks like they picked out the path of least resistance to build a fence." He admitted, however, that he assumed the fence was a fence of convenience because it was not on line and that he had not actually walked the fence. When asked specifically what was more convenient about the fence course than the township course, he replied that he did not know. A neighboring land owner testified for Mr. Cook and stated that fences in the area were frequently off line because they were placed where it was easiest to build. He testified, however, that he did not know

---

1. The transcript of the trial is somewhat difficult to follow. The witnesses and attorneys often referred to various exhibits, including maps and photographs, with descriptors like "here" and "there" or "this" and "that." Presumably, they were gesturing at the trial to indicate the loca-

tion they were talking about, making it understandable to the participants and trial judge. However, because we review a written transcript, such descriptors made it difficult, at times, to fully understand the testimony.

anything in particular about why the fence at issue was placed off line and that he had not looked at the specific area very closely.

[¶ 12] In contrast, Mr. Eddy testified that it was not more convenient to place the fence where it was because the terrain on the fence line was more severe than on the township line. He retained land surveyor Arthur Schubert to prepare a plat of survey showing the disputed property which was entered into evidence at trial.[2] Mr. Schubert was also trained as a geologist and testified as follows:

Q. ... [H]aving gone down the [fence] line and the township line, did you— How did you compare the relief in the two? You are a geologist. You know what I mean.

A. The township line was—you might consider it a more gentle relief, being it's closer to plane than what the fence line would be on the old fence line. The old fence line is of a higher relief, or more rugged, common terms. It deviates from the plane more often than the township line.

Q. In layman's terms, you mean it goes up and down more.

A. It goes up and down more often.

[¶ 13] Mr. Eddy also called fencing contractor, Andy Henson, as a witness. After inspecting the fence line and the township line, he testified:

Q. As you went, did you see any difference between the line of the fence and the survey line for fence building?

A. Yeah, the survey line would have been more accessible for equipment. It would have been less packing, less distance with packing. You can get in way more places with equipment or a horse or anything. You can't even get in some of them places with a horse, but it is more accessible on the survey line.

Q. That's for constructing a fence.

A. Yes, and to fix it. It's an ongoing thing.

Q. So for construction and maintenance it made more sense to follow the survey line, the township line.

A. I would think so, yeah, definitely.

Q. ... Describe the difference in the terrain between the fence line and the survey line, as it went through those gullies?

A. There was way less up and downs on the survey line, changes in elevation. . . .

Mr. Henson stated that, because of the differences in terrain and accessibility, it would probably cost more to build a fence on the fence line than on the township line. On this record, the district court's finding that the township line was no more rugged than the fence line was not clearly erroneous.

[¶ 14] Mr. Cook also argues that the fence was not built in a straight line and there were many deviations in it, suggesting that it was built for convenience rather than as a boundary. He cites to *Kimball v. Turner*, 993 P.2d 303 (Wyo.1999), in support of his argument. In *Kimball* we ruled:

[T]he question for this court is whether the district court's finding of a convenience fence is clearly erroneous. We conclude it is not.

The district court summarized its findings in this fashion:

The physical appearance of the fence ... clearly demonstrates that it could not have been constructed as a boundary fence. To call the structure a fence is generous. It consists of 3 wires meandering between trees, bushes, and fence posts in an irregular fashion. It appears from the physical appearance that someone walked in the east-west direction stringing barbwire from tree to tree, placing fence posts when trees or bushes were not available. The irregular course of the fence clearly indicates that it was not constructed on a section line, a quarter section line, or any other line of a U.S. governmental subdivision parcel. Even to a casual observer, it is

**2.** Because Mr. Schubert was not fully licensed when he prepared the plat, a professional land surveyor reviewed and approved his work.

obvious that whoever built the fence never intended to strictly follow the straight line demarcation of a U.S. Government subdivision description. Clearly, the fence was constructed by Rawsel as a convenient way of separating his homestead from the public domain. The Court is not able to find and conclude that Rawsel constructed the fence as a boundary.

*Id.* at 306.

[¶ 15] The plat of survey reveals three angles in the disputed fence which are obvious to the untrained eye. Mr. Schubert acknowledged that the plat contained 14 different angles of significance to a surveyor. The fence occasionally diverted around trees and was sometimes attached to trees in lieu of posts. Mr. Henson stated that, although the fence was occasionally tied to trees, etc., it did not deviate very much from a straight line, while on its three courses. Mr. Eddy also called Edward Pollock, a ranch land inspector/consultant and former rancher, who testified that he had inspected the fence and, although in places it was built from tree to tree, the fence was generally "very straight."

[¶ 16] The evidence recited above distinguishes the fence here from the one at issue in *Kimball.* Although the instant fence occasionally deviates slightly from a true course to avoid obstacles and uses trees as fence posts, there was ample evidence to support the district court's findings that it generally ran straight in the three primary directions it followed. Moreover, photographs in evidence show it to be a substantial fence containing well maintained wires and incorporating numerous posts and even gates, unlike the meandering structure described in *Kimball.* On this record, we conclude the district court's finding that the fence was a boundary fence rather than a fence of convenience was not clearly erroneous.

[¶ 17] Mr. Cook contends further that he gave Mr. Eddy permission to use the property, thereby negating his claim for adverse possession. Mr. Eddy testified, however, that he never asked Mr. Cook for permission to use the property and Mr. Cook never gave him such permission. Mr. Cook asserts that he implicitly gave Mr. Eddy permission to use the disputed property until he moved the fence when they talked at the sale barn in Torrington in 1988. During that conversation, Mr. Cook apparently informed Mr. Eddy that the fence was off line and he intended to move it to follow the property boundary. Mr. Eddy replied that he had "put the fence up and fixed it back up." To which, Mr. Cook replied, "Oh, you did." The district court obviously did not believe this conversation amounted to implied permission because it concluded that Mr. Eddy's use of the disputed property was not permissive. We agree. To interpret this brief exchange between the parties as implied permission would be stretching it beyond what was actually said.

[¶ 18] Mr. Cook also argues that Mr. Eddy demonstrated no hostile intent to possess the property. He insists Mr. Eddy was required to "raise a flag" of ownership to establish his hostile intent and he failed to do so.[3] Mr. Cook points to the fact that in 1995, when loggers told Mr. Eddy that the fence may be off line, he told them not to log the disputed area because he "didn't want to cause problems with the neighbor." The problem with Mr. Cook's argument is that, by occupying the property and treating it as his own, Mr. Eddy was entitled to a presumption of adverse possession. It was then Mr. Cook's responsibility to prove that Mr. Eddy's possession was not hostile.

[¶ 19] Mr. Cook suggests that Mr. Eddy did not have a hostile intent because he was mistaken as to the property line. There is evidence in the record, including the con-

**3.** We note that Mr. Cook cites to cases pertaining to prescriptive easements, like *Boykin v. Carbon County Bd. of Comm'rs*, 2005 WY 158, 124 P.3d 677 (Wyo.2005), to support his argument. In prescriptive easement cases, we employ a presumption that the use was permissive and place the burden on the party claiming a prescriptive right to prove that his use was adverse. *Id.*, ¶ 15, 124 P.3d at 682; *Powder River Ranch, Inc. v. Michelena*, 2005 WY 1, ¶ 9, 103 P.3d 876, 880 (Wyo.2005). The presumption does not apply to claims of outright ownership of the property by adverse possession.

versation at the sale barn in 1988, to indicate that Mr. Eddy was aware that the fence was off line soon after he began occupying the property. Nevertheless, even if we assume Mr. Eddy was mistaken about the true property boundary, Mr. Cook's argument still fails. We discussed mistake in the context of adverse possession long ago in *Rock Springs v. Sturm*, 39 Wyo. 494, 273 P. 908 (Wyo. 1929). We recently reiterated *Sturm's* salient holdings in *Murdock v. Zier*, 2006 WY 80, 137 P.3d 147 (Wyo.2006):

> [W]hen a man has occupied a piece of ground, though under a mistaken belief as to the true boundary, for the period prescribed by law, openly, notoriously, exclusively, and in a manner plainly indicating that he acted as owner thereof, the presumption should be, in the absence of explanatory circumstances showing the contrary, that he occupied the land adversely and under a claim of right, casting the burden of explaining such possession upon the person who disputes his right.

*Id.,* ¶ 15, 137 P.3d at 151, quoting *Sturm*, 39 Wyo. at 517, 273 P. at 915–16.

[¶ 20] Applying the *Sturm* principles, even if Mr. Eddy possessed the property under the mistaken belief that he owned it (a question we do not need to decide), he is still entitled to a presumption that he occupied the property adversely. Thus, Mr. Cook's argument as to mistake does not satisfy his burden to explain Mr. Eddy's possession of the disputed property.

[¶ 21] Finally, Mr. Cook claims that Mr. Eddy's possession was not exclusive. He argues that he asserted ownership over the disputed property by: paying taxes on it, having grasshoppers aerially sprayed, and leasing the mineral rights. Mr. Cook further asserts that he possessed the disputed property by cutting fence posts and poles from it and accessing it for fence repairs. The district court ruled that Mr. Eddy's possession of the property was exclusive, although it did not discuss that ruling in detail.[4]

[¶ 22] In *Doenz v. Garber*, 665 P.2d 932, 937 (Wyo.1983), we explained that non-payment of taxes by the adverse possessor or the payment of taxes by the owner of record, while a consideration, does not circumvent an adverse possession claim. In fact, "[n]onpayment of taxes by the claimant is usually the case where use to a fence line rather than deed line is the primary basis of the claim." *Id.* Here, the district court obviously was not convinced that Mr. Cook's payment of taxes, grasshopper spraying, or leasing of the minerals amounted to possession of the disputed property. On this record, that finding was not clearly erroneous. Those transactions simply included the disputed property with Mr. Cook's other property because he was the record owner and they do not amount to evidence of possession of the property by Mr. Cook sufficient to overcome the presumption in favor of Mr. Eddy.

[¶ 23] Mr. Cook also argues that he asserted ownership over the disputed area by cutting posts and poles on it and accessing it to repair the fence. He testified:

> Q. Now, during the time that you have been on that area, what have you used the disputed area for during the time that you are growing up, all the way to the present day?
>
> A. I remember going in there with my parents and ranch employees, cutting posts and poles. We had to use it every year just for access to the fences to repair. There are places you had to go into that area to get to the fences.
>
> Q. Do you maintain those fences still today?
>
> A. Oh, yes.
>
> Q. And, so, you go into that disputed area to get to areas of the fence that you can't reach from the north side; is that correct?
>
> A. Right.
>
> Q. And you do that at least annually, every year?
>
> A. Yes.

4. "When the district court does not accompany its decision with express findings of fact, we assume that the general finding by the court carries with it every finding of fact supported by the record." *Reynolds v. Milatzo*, 2007 WY 104, ¶ 11, 161 P.3d 509, 513 (Wyo.2007).

[¶ 24] Mr. Cook's testimony about cutting posts and poles did not convince the district court that Mr. Eddy's possession was not exclusive. We find nothing in the record to indicate the district court's evaluation of the evidence was clearly erroneous. Even if we assume Mr. Cook's testimony that he cut posts and poles from the disputed property was credible, there is no indication of whether those activities took place during Mr. Eddy's tenure. Photos that were admitted into evidence show what appear to be older areas of timber cutting. Giving the evidence every inference in favor of Mr. Eddy, as our standard of review directs, Mr. Cook's testimony suggests that the cutting took place quite some time ago.

[¶ 25] Mr. Cook's statement that he accessed the disputed property to fix the fence also does not support his claim that he possessed it. In *Davis v. Chadwick,* 2002 WY 157, 55 P.3d 1267 (Wyo.2002), we agreed with the Oregon Supreme Court's statement that " 'exclusive' does not mean absolutely exclusive, but only such use as would be 'expected of an owner under the circumstances.' " *Id.,* ¶ 15, 55 P.3d at 1273, quoting *Nelson v. Vandemarr,* 281 Or. 65, 573 P.2d 1232, 1237 (1978). There is no indication that Mr. Cook's presence on the property for fence repair was pursuant to an assertion of ownership. Instead, his own testimony indicates that he simply went on the disputed property to get better access to maintain the fence. That was nothing more than any neighboring land owner might do and does not undermine Mr. Eddy's assertion of exclusive possession. *See, e.g., Davis,* ¶ 15, 55 P.3d at 1273; *Nelson,* 573 P.2d at 1237 (holding that "[a]llowing a neighbor on one's driveway for the purpose of pruning trees is just the sort of use one would expect" and such evidence does not negate the element of exclusiveness). Given the evidence that Mr. Eddy possessed the disputed land each year and treated it as his own and that Mr. Cook failed to conduct any activities of significance on the property, we conclude the district court's finding that Mr. Eddy's possession was exclusive was not clearly erroneous.

[¶ 26] The record supports the district court's determination that Mr. Eddy was en-titled to a presumption that he adversely possessed the property. Mr. Cook has not directed us to any evidence which convinces us that the district court's ultimate conclusion that he did not overcome the presumption was erroneous. Consequently, the district court did not err by ruling that Mr. Eddy had acquired title to the disputed property by adverse possession.

[¶ 27] Affirmed.