Argued and submitted July 9, 2001, reversed and remanded March 13, 2002

# Rick D. GIBBONS
## and Karen Gibbons,
*Appellants,*

*v.*

# Paul P. LETTOW
## and Dianne L. Lettow,
*Respondents.*

## 99CV3178CC; A111902

42 P3d 925

Stephen Mountainspring argued the cause for appellants. With him on the briefs was Dole, Coalwell, Clark, Mountainspring & Mornarich, P.C.

Richard B. Brissenden II argued the cause for respondents. With him on the briefs was Daniel R. Lang.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

LANDAU, P. J.

## LANDAU, P. J.

At issue in this case is the right to possess a strip of land that lies between the parties' properties. Plaintiffs, who hold title of record to the strip, brought an action for ejectment and damages. Defendants counterclaimed, seeking a declaration quieting title in their favor based on theories of adverse possession, boundary by agreement, and "mutual acquiescence." The trial court found in favor of defendants on their theory of adverse possession. Plaintiffs appeal, arguing that defendants failed to prove by clear and convincing evidence the elements of adverse possession, in particular, the requirement of continuous possession for ten years. Defendants contend that, even if they did not establish the elements of adverse possession, they established a right to possession under their alternative theories. We agree with plaintiffs that there was a failure of proof on the adverse possession counterclaim and that, likewise, defendants have failed to establish a right to possession under any of their alternative theories. We therefore reverse and remand.

The relevant facts are not in dispute. The parties own adjacent parcels in rural Douglas County, plaintiffs' property lying to the east and defendants' to the west of the boundary that runs in a north-south direction between the parcels. Both properties originally were held as part of a single parcel by Remick Cowles. In 1857, Cowles cut out two parcels and sold them to different persons, whose identities the record does not disclose. The record does make clear, however, that the boundary between what is now plaintiffs' and defendants' properties was established at that time.

Some time before the 1940s, someone—no one knows who—built a barbed-wire fence running along the boundary, 45 to 60 feet east of the boundary on plaintiff's property, for approximately 875 feet. During that time, there was a sawmill on what is now defendants' property, but there is no evidence of how anyone used the disputed strip of property between the boundary and the barbed-wire fence.

Ernest Pruner acquired what is now plaintiffs' property in 1933. Meanwhile, at some time before 1961, J. R. Buckley acquired what is now defendants' property. Buckley

operated the sawmill on his property for some unspecified period of time, and there is evidence that, at some unspecified time, he disposed of sawmill debris on the disputed strip.

On June 17, 1961, Buckley sold his property to Lynnwood Jones, who ceased operation of the sawmill, cleaned up the debris on the disputed strip and filled in what he characterized as a "log pond" shortly after acquiring the property. Beginning in 1963 or 1964, Jones used his property for grazing between one and three cows or horses and, on occasion, grazed his animals up to the fence. There is no evidence as to the frequency with which he grazed his animals in the disputed strip.

At some point between 1961 and 1971, the fence fell down at the north end of the disputed strip. Pruner suggested to Jones that they just leave the fence down and plant a shared garden straddling the fence line. They did so, and, for some unknown period of time, they shared the garden, each taking produce grown on his side of the fence line. There is no evidence of any dispute between Pruner and Jones about the property line. Jones assumed that the fence line corresponded to the true boundary. What Pruner said or thought about the matter is unknown.

In 1971, Jones sold his property to the Carlsons; in 1973, the Carlsons sold the property to the Pelkes. There is no evidence of either the Carlsons' or the Pelkes' use of their property or of the disputed strip.

In 1975, the Pelkes sold the property to David and Jeanene Wright. The Wrights occasionally grazed two to four head of cattle on their property. As to the disputed strip, Mrs. Wright testified:

> "During the time my husband and I occupied the property, we did not intend to claim ownership to any property beyond our deed description. We were not certain whether or not the fenceline in question was or was not a boundary line fence and we did not make any claim to or attempt to increase our ownership by reason of the mislocation of the fenceline.

"During the time my husband, Dave, and I owned the property * * * we made infrequent use of the property adjacent to the fenceline located on the east of the property. Occasionally we had some livestock but, for the majority of the time, we made no use of this property at all and it was overgrown with blackberries and other vegetation."

Meanwhile, Pruner sold what is now plaintiffs' property to Donald and Priscilla Wren in 1977. The Wrens also occasionally grazed cattle on their property. Mr. Wren testified that he questioned whether the fence line represented the true property line, but that it did not make a difference at the time, because no one used the disputed strip very much. "There was never any agreement or discussion between me and the Wrights about the fence line, the property line, or their respective locations," Mr. Wren testified. "I very seldom spoke with the Wrights." When he grazed cattle, he kept the fence in good repair so that his stock would not wander over to his neighbors' property, but he did not intend to cede any rights to his property in the process.

The Wrights sold their property to the Glasures in 1990. The Glasures never occupied their property or the disputed strip. The following year, they sold the property to defendants. The Wrens sold their property to plaintiffs in 1988.

In 1999, the parties disputed ownership of the strip west of the fence line. In 2000, a survey was conducted that shows the true boundary line to lie 45 to 60 feet west of the fence line. This action followed the completion of the survey.

Following trial, the court found for defendants. The court did not enter specific findings. It did state, however, that defendants prevailed on their theory of adverse possession. Because the court concluded that defendants were entitled to possession of the disputed strip, the court apparently did not reach plaintiffs' ejectment claim. The court also awarded defendants their costs. On appeal, plaintiffs argue that the trial court erred: (1) in finding for defendants on a theory of adverse possession; (2) in failing to award them relief on their ejectment claim; and (3) in awarding defendants' costs without first permitting plaintiffs to object.

We begin with plaintiffs' contention that the court erred in finding for defendants on their theory of adverse possession. According to plaintiffs, defendants failed to establish their hostile possession of the disputed strip for the requisite period of ten continuous years. Defendants contend that they demonstrated two separate periods of possession longer than ten years: (1) from February 1961 through June 1971 and (2) from 1975 to 1990.

We review the trial court's decision *de novo*. ORS 19.415; *Brunswick v. Rundell*, 126 Or App 582, 585, 869 P2d 886 (1994). Defendants bear a "heavy burden" to establish common-law ownership by adverse possession. *Whitley v. Jacobs*, 278 Or 541, 547, 564 P2d 1057 (1977).[1] They must establish, by clear and convincing evidence, that their use of the property in dispute was "actual, open, notorious, exclusive, continuous, and hostile for a 10-year period." *Hoffman v. Freeman Land and Timber, LLC.*, 329 Or 554, 559, 994 P2d 106 (1999). To be "continuous," use of the property in dispute "must be constant and not intermittent." *Id.* at 560. As the Supreme Court explained in *Reeves et al. v. Porta*, 173 Or 147, 153, 144 P2d 493 (1994), "[t]he claimant * * * must keep his flag flying, and present a hostile front to all adverse pretensions." (Internal quotations omitted.) Where use is premised on livestock grazing, continuity may be established by showing continuous use during the pasturing season. *Hoffman*, 329 Or at 560-61.

In this case, assuming that defendants demonstrated the other elements of their adverse possession counterclaim, the fact remains that they failed to establish by clear and convincing evidence the continuity of their or their predecessors' use of the disputed strip for at least ten years. The evidence as to neither of the two periods of use on which defendants rely suffices.

We begin with the period from February 1961 through June 1971. At best, defendants have demonstrated that, from February 1961 to June 17, 1961, Buckley ran a

---

[1] ORS 105.620 states slightly different elements of an adverse possession claim. That statute applies only to interests that vest after January 1, 1990, however. At oral argument, defendants explained that they are not contending that their interests vested after that date.

sawmill on his property and that, at some point during that time, he may have stored log debris on the disputed strip. The following year, however, the debris was cleared. Not until 1963, at the earliest, did Buckley's successor, Jones, begin to run cattle on his property. There is testimony that he permitted his cattle to graze up to the fence line. But there is a complete absence of evidence as to the duration of the grazing activity or the frequency with which it occurred up to the fence line. There certainly is no evidence that the grazing occurred every season from 1963 through June 6, 1971, much less that it occurred on the disputed strip every season during that time. *Hoffman*, 329 Or at 560-61.

We turn to the period from 1975 to 1990. Once again, defendants rely on grazing activity, this time by the Wrights. And once again, there is a problem with defendants' proof of the frequency of the grazing. Mrs. Wright clearly testified that:

> "[W]e made infrequent use of the property adjacent to the fenceline located on the east of the property. Occasionally we had some livestock but, *for the majority of the time, we made no use of this property at all* and it was overgrown with blackberries and other vegetation."

(Emphasis added.) There is a complete absence of evidence of continuous use of the disputed strip by defendants' predecessors from 1975 to 1990.

In short, defendants failed to establish that they or their predecessors made use of the disputed strip for any continuous ten-year period. The trial court therefore erred in concluding that they had established the elements of their adverse possession counterclaim.

Defendants argue that, even if they failed to establish adverse possession, they still are entitled to possession under their alternative theories of boundary by agreement and boundary by acquiescence. We begin with their claim of boundary by agreement. There are three essential elements:

> "First, there must be an initial uncertainty or dispute as to the 'true' location of the boundary. The stated purpose of this requirement is to prevent the agreement from falling

within the Statute of Frauds or violating other real property conveyancing requirements, for it establishes that the parties are resolving a dispute by mutually fixing an unknown boundary rather than by making a conveyance of land. The element of resolution of uncertainty may also provide the consideration for the agreement. * * *

"Second, the uncertainty must be resolved by an agreement, express or implied, to recognize a particular line as the boundary. The boundary recognized must be mutually intended as permanent, not as a tentative or temporary boundary or as a mere barrier. The parties must intend to resolve the uncertainty; an attempt to locate the 'true' line cannot change the boundary described in the deed.

"Finally, the parties must evidence their agreement by subsequent activities. If the agreement is memorialized in writing, it may be recorded in the chain of title to establish the recognized dividing line. If there is an express oral agreement, courts have required occupation to the boundary line in question."

*Ross v. DeLorenzo*, 65 Or App 586, 590, 672 P2d 1338 (1983), *rev den* 296 Or 411 (1984) (citations omitted). An agreement between the parties may be express or implied. *Id.* at 591. To demonstrate an agreement by implication, however, the conduct of the parties must be shown to "manifest a mutual intent to resolve an uncertainty by recognizing a particular line as the boundary." *Id.*

 It bears some emphasis that boundary by agreement may not be established by placing a fence where both parties think the actual boundary lies; the agreed-upon boundary must represent an attempt to resolve the parties' uncertainty as to the true location of the boundary. *Drury et ux v. Pekar et al*, 224 Or 37, 44, 355 P2d 598 (1960); *Blaisdell v. Nelsen*, 66 Or App 511, 515 n 3, 674 P2d 1208 (1984). We review a trial court's findings with respect to a boundary by agreement claim *de novo*. *Brunswick*, 126 Or App at 585.

 In this case, defendants have not established the elements of their boundary by agreement claim. Although, at varying points in time, different owners evinced uncertainty about the location of the true boundary, there is no evidence of any communication of that uncertainty between them,

much less an agreement to recognize a particular line as a boundary.

Defendants insist that the fact that the parties respected the fence line over the course of many years demonstrates an implied agreement to establish a boundary between the properties. Certainly the erection and maintenance of a fence *could* be taken as evidence of a boundary by agreement. *See, e.g., Blaisdell*, 66 Or App at 515 ("The manner in which the fence was erected indicates that the parties were uncertain about the location of the true boundary."). The problem is that the erection and maintenance of a fence *could* be taken as evidence of other things as well, for example, as an attempt to establish the location of the true boundary or merely as a means of keeping in cattle without regard to any particular boundary. *See, e.g., Drury*, 224 Or at 44 ("It appears probable from the evidence that the old fence line was put in to restrain cattle, rather than an exact dividing or boundary line."); *see also Nooteboom v. Bulson*, 153 Or App 361, 365, 956 P2d 1042, *rev den* 327 Or 431 (1998) ("the significance of a fence and of its state of repair in any particular case depends on the character of the land and what the fence communicates to others about possession of the disputed property").

In this case, there is no evidence as to who first erected the fence, much less when or why it was erected. Moreover, the evidence of why it was maintained is conflicting, at best. Jones assumed that the fence line represented the true boundary and, for that reason, saw no problem with splitting the produce from the shared garden along the fence line. Mrs. Wright, on the other hand, testified that she and her husband were not certain whether the fence line represented the true property line and never intended to claim ownership beyond the record boundary. Mr. Wren testified that he questioned whether the fence represented the true boundary line, but he never spoke to the Wrights about it, because no one used the disputed strip very much. He further testified that, although on occasion he repaired the fence, he did so to keep his cattle from wandering over to the Wrights' property, not to create a permanent boundary.

■ We conclude that defendants simply failed in their proof. Again, the conduct of parties in maintaining an existing fence does not necessarily manifest a mutual intent to establish a permanent boundary to resolve any uncertainty about the location of the boundary. In this case, the parties' explanations of their conduct suggest that the maintenance of the fence was intended either to track the true boundary or merely to restrain cattle from wandering onto a neighbor's land.

■ ■ We turn to defendants' claim of boundary by acquiescence. "Boundary by acquiescence" refers to a doctrine by which courts recognize a boundary line to which parties have agreed for a substantial period—long enough that, even though the other requirements of boundary by agreement are not present, the courts will recognize the boundary line "in the interest of justice." *Ross*, 65 Or App at 591 (citing 2 Tiffany, *Law of Real Property* § 654, 682-87 (3d ed 1975)).[2] At the least, the location of the true boundary must be unknown and disputed. Tiffany, *Law of Real Property* § 654, at 684.

■ In this case, defendants have not demonstrated that there ever—at least before 1999—was a dispute about the location of the line. All that the evidence shows is that some previous owners thought the fence line represented the true boundary line, while others thought that it did not and that it did not matter because the area to the west of it was so infrequently used, while still others thought that it did not and that there were good reasons other than identifying a boundary for the fence to be maintained where it was. We conclude that defendants failed to demonstrate that it is "in the interests of justice" to adopt the fence line as the boundary line.

---

[2] In *Hammack v. Olds*, 93 Or App 161, 165 n 4, 761 P2d 541 (1988), *rev den* 307 Or 303 (1989), this court, citing *Blaisdell*, noted that the theories of boundary by agreement and boundary by acquiescence are "indistinguishable." That is not quite correct. What we said in *Blaisdell*—correctly—is that "boundary by acquiescence" sometimes is used to refer to "boundary by agreement" and that we prefer the former term. 66 Or App at 514. We further noted that the term "boundary by acquiescence" also is used to refer to a different doctrine, the one described in *Ross*, by which courts may recognize a boundary even when the requirements of boundary by agreement are not present. *Id.* at 514 n 1.

■ In sum, we conclude that the trial court erred in concluding that defendants are entitled to possession of the disputed strip under a theory of adverse possession. We also conclude that defendants failed to establish their right to possess the strip under any other theory. Given those conclusions, it necessarily follows that the award of costs to defendants must be vacated. That leaves only plaintiffs' contention that the trial court erred in failing to grant them relief on their ejectment claim. As we have observed, the trial court apparently did not reach that claim because it concluded that defendants had established their right to the disputed strip by adverse possession. Given our conclusion that defendants, in fact, did not establish their adverse possession claim, the ejectment claim becomes a live issue for resolution on remand. *Sullivan v. Johnson*, 155 Or App 183, 191, 964 P2d 270 (1998).

Reversed and remanded.